UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN McLELLAN,

                                              **REPORT**
                              Plaintiff,        **and**
                                          **RECOMMENDATION**
                    v.
                                          **04-CV-314A(F)**
E.I. DuPONT de NEMOURS & COMPANY, INC.,
KENNETH W. PORTER, Plan Administrator of
 DuPont Pension and Retirement Plan,
DuPONT PENSION AND RETIREMENT PLAN, and
E.I. DuPONT de NEMOURS & COMPANY, as Plan
 Administrator of DuPont Pension and Retirement
 Plan,

                              Defendants.

_____

APPEARANCES:          BARRY J. DONOHUE, ESQ.
                      Attorney for Plaintiff
                      77 Broad Street
                      Tonawanda, New York 14150

                      PHILLIPS LYTLE LLP
                      Attorneys for Defendants
                      JAMES R. GRASSO, of Counsel
                      3400 HSBC Center
                      Buffalo, New York 14203


## JURISDICTION

        This action was referred to the undersigned by Honorable Richard J. Arcara on

June 4, 2004 for report and recommendation on dispositive motions.  The matter is

presently before the court on Plaintiff's motion for partial summary judgment (Doc. No.

60) filed December 14, 2005, and on Defendants' motion for summary judgment (Doc.

No. 65) filed December 16, 2005.

## BACKGROUND

Plaintiff John McLellan ("McLellan" or "Plaintiff") commenced this action on April 21, 2004, alleging Defendants, E.I. DuPont de Nemours & Company, Inc. ("DuPont"), Kenneth W. Porter, Plan Administrator of DuPont Pension and Retirement Plan ("Porter"), and Dupont Pension and Retirement Plan ("the Plan"), violated federal and state laws to deny Plaintiff retirement benefits to which he is entitled, and terminated Plaintiff's employment based on Plaintiff's age. In particular, Plaintiff asserts five claims for relief, including (1) DuPont employed Plaintiff through a temporary agency and then terminated Plaintiff's employment to interfere with Plaintiff's attaining entitlement to benefits under the Plan and as protected by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq*., including pension benefits, in violation of 29 U.S.C. § 1140 ("the First Cause of Action"); (2) Porter, as Plan Administrator failed and refused to provide Plaintiff with requested Plan documents in violation of 29 U.S.C. § 1132(c)(1) ("the Second Cause of Action"); (3) the Plan wrongly refuses to recognize Plaintiff as a DuPont employee entitled to pension benefits under the Plan in violation of 29 U.S.C. § 1132(a)(1)(B) ("the Third Cause of Action"); and (4) & (5) Plaintiff's age was a motivating factor in DuPont's decision to terminate Plaintiff, in violation of Federal equal employment opportunity laws, 29 U.S.C. §§ 621 *et seq.* and New York's Human Rights Law, New York Executive Law ("N.Y. Exec. Law") §§ 296 *et seq.* (respectively, "the Fourth and Fifth Causes of Action").[1]  By two separate Stipulation and Orders, both filed on November 18, 2004, Plaintiff withdrew the Third Cause of Action, without

---

[1] Unless otherwise noted, references to N.Y. Exec. Law are to McKinney 2005.

prejudice (Doc. No. 22), and Porter was terminated as a Defendant to this action, with

DuPont substituted as Defendant Plan Administrator ("Plan Administrator") (Doc. No.

23).

On December 14, 2005, Plaintiff moved for partial summary judgment on his

Second Cause of Action alleged against the Plan Administrator for civil penalties for

refusing to furnish Plaintiff with requested Plan documents (Doc. No. 60) ("Plaintiff's

Motion").  In support of the motion, Plaintiff filed the Affirmation of Barry J. Donohue,

Esq. ("Donohue") (Doc. No. 61) ("Donohue Affirmation"), with attached exhibits A

through K ("Plaintiff's Exh. __"), a Statement of Undisputed Facts (Doc. No. 62)

("Plaintiff's Undisputed Facts Statement"), and a Memorandum of Law (Doc. No. 63)

("Plaintiff's Memorandum").  On December 16, 2005, Defendants moved for summary

judgment seeking to dismiss the action in its entirety (Doc. No. 65) ("Defendants'

Motion").  Filed in support of the motion were Defendants' Statement of Material Facts

as to Which They Contend There Is No Genuine Issue To Be Tried (Doc. No. 66)

("Defendants' Undisputed Facts Statement"), the Declaration of James R. Grasso, Esq.

("Grasso") (Doc. No. 67) ("Grasso Declaration"), with attached exhibits J through K

("Grasso Declaration Exh. __"), the Declaration of Douglas M. Clarke, Jr. ("Clarke")

(Doc. No. 68) ("Clarke Declaration"), with attached exhibit A ("Clark Declaration Exh.

A"), the Declaration of Mary Jo Anderson, Esq. ("Anderson") (Doc. No. 69) ("Anderson

Declaration"), with attached exhibits 1 through 34 ("Anderson Declaration Exh. __"),[2]

_____

[2] Directly attached to the Anderson Declaration are Anderson Declaration Exhs. 1 through 24. Anderson Declaration Exhs. 25 through 34 were filed in a separate volume as a Continuation of Exhibits (Doc. No. 70).  As all the exhibits pertain to and are referenced in the Anderson Declaration, regardless of whether attached to the Anderson Declaration, or contained in the Continuation of Exhibits, the court refers to all such exhibits as "Anderson Declaration Exh. __".

and Defendants' Memorandum of Law in Support of Their Motion for Summary

Judgment (Doc. No. 71) ("Defendants' Memorandum").

On January 27, 2006, Defendant Plan Administrator filed a Memorandum of Law

of E.I. DuPont de Nemours & Company as Plan Administrator of DuPont Pension and

Retirement Plan in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 76)

("Defendants' Response"), and a Statement of Defendant E.I. DuPont de Nemours &

Company as Plan Administator of DuPont Pension and Retirement Plan of Material

Facts as to Which It Contends that there Exists a Genuine Issue to be Tried (Doc. No.

77) ("Plan Administrator's Disputed Facts Statement").   On January 27, 2006, Plaintiff

filed in opposition to Defendants' Motion the Answering Affirmation of Donohue and

Local Rule of Civil Procedure 56.1 Response (Doc. No. 79) ("Donohue Response

Affirmation"), and a Memorandum of Law (Doc. No. 80) ("Plaintiff's Response").

Attached to the Donohue Response Affirmation is a copy of the Affidavit of McLellan

(Doc. No. 12) ("First McLellan Affidavit"), initially filed on in connection with Plaintiff's

earlier motion for partial summary judgment (Doc. No. 9) filed on August 5, 2004, which

Plaintiff subsequently withdrew by Order and Stipulation dated November 18, 2004

(Doc. No. 22).[3]

On February 10, 2006, Defendants filed in further support of summary judgment

Defendants' Reply Memorandum of Law in Support of Their Motion for Summary

Judgment (Doc. No. 82) ("Defendants' Reply").   Plaintiff, on February 10, 2006, filed the

---

[3] Although Plaintiff did not refile the First McLellan Affidavit in connection with his instant motion for partial summary judgment, the document is incorporated by reference in the Donohue Response Affirmation (Doc. No. 79) ¶ 3 ("Incorporated herein by reference is the affidavit of John McLellan of August 3, 2004 previously filed with the court at Docket # 12.").

Affidavit of John McLellan (Doc. No. 83) ("Second McLellan Affidavit"), and a Memorandum of Law (Doc. No. 84) ("Plaintiff's Reply").  Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion for partial summary judgment on the Second Cause of Action should be GRANTED; Defendants' motion for summary judgment should be DENIED as to the Second Cause of Action, and GRANTED as to the First, Fourth and Fifth Causes of Action.

## FACTS[4]

Plaintiff John McLellan, who was born on July 23, 1939, initially commenced working for Defendant DuPont, full-time, on September 9, 1963 at DuPont's Niagara Falls, New York Plant ("the Niagara Falls Plant"), where McLellan continued to work until June 18, 1972 ("first employment period").[5]  Between 1959 and July 29, 1971, a DuPont employee needed 15 years service to vest in DuPont's pension benefit plan ("the Plan").  On July 30, 1971, the Plan was amended to require only 10 years service to vest.  On June 18, 1972, McLellan, pursuant to a company lay off, was terminated, 14 months short of vesting in the Plan. Throughout this period of employment, McLellan held various positions, and was working as a substation operator when he was laid off.

---

[4] Taken from the pleadings and motion papers filed in this action.

[5] There is some discrepancy as to the exact dates of McLellan's first employment period with DuPont.  In particular, it is alleged in the Complaint that McLellan "was employed by Defendant DuPont from 1962 to 1971 . . . ." Complaint ¶ 11.  McLellan states he initially was employed by DuPont "from approximately September 15, 1963 to approximately March 15, 1972."  First McLellan Affidavit ¶ 2.  The parties later agreed that the dates of McLellan's first employment period are September 9, 1963 to June 18, 1972.  Donohue Response Affirmation ¶ 3; Defendants' Undisputed Facts Statement ¶ 2.  To avoid unnecessary confusion, the court uses the last dates upon which the parties have agreed.

On December 20, 1996, McLellan, acting upon information from a friend that DuPont was in need of additional help in the area of field supervision, wrote to DuPont employee Steven Keppler ("Keppler"), with whom Plaintiff previously had worked at DuPont, seeking employment in such position.  McLellan was invited to interview for a Contract Field Coordinator ("CFC") position, and subsequently had two interviews, the first interview conducted by Keppler over the telephone, and the second interview a meeting in person with DuPont employees Edward Lilly ("Lilly") and Stanley Kasprzak ("Kasprzak").  During the interviews, McLellan was advised that if selected for the CFC position, McLellan would be assigned to the strontium project which involved modifying DuPont's sodium production process to produce strontium, and primarily entailed coordinating work performed by electrical contractors at the Niagara Falls Plant. Following the second interview, Keppler telephoned McLellan and offered McLellan the CFC position at the Niagara Falls Plant, advising McLellan that he would be hired through the AdeccoTAD employment agency ("Adecco" or "the Agency").[6]  On December 19, 1997, McLellan completed an Enrollment Form for Adecco's Qualified Retirement Plan, specifically, "The TAD 401(k) Plan."[7]

On January 8, 1997, McLellan signed an Employment Agreement ("the Employment Agreement")[8] which identified McLellan as the "Employee," Adecco as the "Company," and DuPont as the "Client."  Employment Agreement ¶ 1.  The Employment

---

[6] When Plaintiff was hired for the CFC position, the employment agency's name was "TAD Technical Services Corporation," which was subsequently changed to "AdeccoTAD."

[7] Grasso Declaration Exh. E.

[8] Grasso Declaration Exh. D.

Agreement provided that on January 13, 1997, McLellan would commence working at

Dupont's Niagara Falls Plant as an hourly employee paid by the Agency, that McLellan

acknowledged that the work for which he was being hired was temporary and that

DuPont, as the Client, could terminate McLellan's assignment at any time and for any

reason, and that McLellan was eligible to participate in Adecco's group medical and life

insurance programs.  Employment Agreement ¶¶ 1, 2, 4 and 13.  The Employment

Agreement does not identify anyone as the employer, supply the title of the position for

which McLellan was hired, specify the term of employment, nor identify to whom

McLellan would report or by whom he would be supervised.  Pursuant to the

Employment Agreement, McLellan commenced working full-time at DuPont's Niagara

Falls Plan on January 13, 1997, and continued to work there until June 28, 2003

("second employment period").

On October 1, 1996, before McLellan accepted employment in DuPont's CFC

position, DuPont's Plan was amended to provide that a DuPont employee would vest in

a pension after five years service.  1996 Amended Plan (Plaintiff's Exh. G) § V.A(1).

The section of the 1996 Amended Plan entitled "Preamble" specifies that "[t]he Plan, as

restated, is intended to be a defined benefit plan qualified under Section 401(a) of the

Internal Revenue Code of 1986, as amended, and to satisfy the requirements of the

Employee Retirement Income Security Act of 1974, as amended."  1996 Amended Plan

at 2.  According to the 1996 Amended Plan, "[t]he term 'employee' . . . includes all

employees of the Company [DuPont]."  1996 Amended Plan § IX.A(1)(a) (bracketed text

added).  Nevertheless, the Plan excluded several classes of workers from vesting,

including "individuals who must be treated as employees of the Company [DuPont] for

limited purposes under the 'leased employee' provisions of Section 414(n) of the [Internal Revenue] Code." 1996 Amended Plan § IX.A(1)(g) ("the leased employee exclusion") (bracketed text added).[9]

The 1996 Amended Plan also defines "service" as "the length, in years and fractions of a year, of an employee's period of 'continuous service' for computing the amount of a pension as determined under [DuPont's] Continuity of Service Rules. . ." and toward vesting. 1996 Amended Plan § IX.A(3)(a). In particular, an employee compensated for 1,000 or more hours during a computation period is to be credited with one year of service and, after establishing such year of service, the employee is to be credited with an additional year of service for each subsequent computation period during which the employee is compensated for 1,000 or more hours. 1996 Amended Plan § IX.A(3)(a)(i). A "computation period" is defined as "a period of 12 consecutive months commencing the later of January 1, 1976, or the employee's first date of employment or reemployment, whichever is applicable, or any succeeding anniversary of such date." 1996 Amended Plan § IX.A(3)(c). So long as an employee is compensated for at least 500 hours during a computation period, the employee will not incur a break in service, but the employee will not receive service credit for any computation period in which the employee is compensated for less than 1,000 hours. 1996 Amended Plan § IX.A(3)(a)(ii) and (b)(ii). The 1996 Amended Plan does not,

---

[9] Submitted as Anderson Exhs. 8-30 are select pages of the Plan as amended and in effect from October 1996 through June 2003, when McLellan last worked at DuPont's Niagara Falls Plant, on which appear the Plan's definition of an employee eligible to participate in the Plan. Despite the numerous Plan amendments, the Plan, throughout McLellan's second employment period, consistently excluded from Plan participation eligibility "individuals who must be treated as employees of the Company for limited purposes under the 'leased employee' provisions of Section 414(n) of the Code." Anderson Exhs. 8-30.

however, provide for the complete and permanent forfeiture of any prior service for which credit is temporarily lost based on a break in service; rather, if an employee incurs a break in service, *i.e.*, is compensated for less than 500 hours during a computation period, credit for such prior service will nor be counted until and unless the employee is compensated for at least 500 hours in a computation period, at which time credit for such prior service will be restored. 1996 Amended Plan § IX.A(3)(a)(iii). Finally, the Plan provides, as relevant to the instant case, that "[e]ach employee shall become a participant in the Plan on his first day of employment or reemployment, except that an employee whose service is not credited under the Continuity of Service Rules shall not be eligible to participate in the Plan prior to January 1, 1976."  1996 Amended Plan § IX.A(3)(f).[10]

Upon commencing rendering services to DuPont in the CFC position, McLellan submitted all time cards to the Agency for payment.  DuPont furnished McLellan with a computer, added McLellan to DuPont's e-mail system, and assigned McLellan a DuPont telephone number and an office, rather than a cubicle, at the Niagara Falls Plant. McLellan had access to DuPont's vehicles which he frequently used for job duties and services both at the Niagara Falls Plant and offsite.  McLellan also carried business cards on which "Adecco TAD Technical" appears at the top, yet McLellan is referred to

---

[10] According to a Summary Plan Description ("SPD") dated July 2003, the Plan provided that upon rehire by DuPont, a former DuPont employee's service from his prior period of employment would be restored for vesting purposes, and that the amount of any pension would be calculated based on the second period of employment plus the service restored from the first period of employment.  2003 Amended Plan (Plaintiff's Exh. H), at 23 § 2.  The SPD does not contain the leased employee exclusion, nor does the SPD explain that service prior to January 1, 1976 may not be recognized in establishing Plan participation eligibility.  Further, the SPD in effect upon the commencement of McLellan's second employment period is not in the record.

as "DuPont Sodium Field Project Coordinator," followed by the address for DuPont's Niagara Falls Plant and a DuPont telephone number.  Grasso Declaration Exh. F.

McLellan maintains that in addition to his regular job duties performed at the Niagara Falls Plant, McLellan attended a seminar in Grand Island, New York, for DuPont employees, attended a computer training course for DuPont employees on Microsoft and Intel products in Amherst, New York, acted as DuPont's representative in inspecting an electric control panel in Cheektowaga, New York in connection with "a special project at the Niagara Falls site," and attended, with David Talarico ("Talarico"), an engineer directly employed by Dupont, a DuPont seminar at Ajax, Ontario, on DuPont fire and safety standards.  First McLellan Affidavit ¶ 13.  All of McLellan's expenses associated with such trips were paid by DuPont.  First McLellan Affidavit ¶ 13.

The "dozens of projects" McLellan performed while at DuPont were all assigned by DuPont without consultation with Adecco.  First McLellan Affidavit ¶ 15.  DuPont set McLellan's regular work hours as well as occasional mandated overtime hours. *Id*. ¶ 16.  Although McLellan's weekly pay was directly deposited in McLellan's bank account by Adecco, McLellan received award bonuses and disbursement reimbursements from DuPont.  *Id*. ¶ 17.  McLellan did not hire or pay assistants, but was directly involved in hiring contractors for such jobs as repairing a compactor, and approved payment by DuPont to such contractors. *Id*. ¶ 18.  McLellan was involved in DuPont's regular business insofar as McLellan worked on DuPont's machines used to manufacture DuPont's products, and supervised and directed DuPont employees and contractors. *Id*. ¶ 19.  While working for DuPont, McLellan was not in business for himself and McLellan's pay, including withholding payroll taxes, and payment of vacation, holiday

and overtime pay came from Adecco.  *Id*. ¶ 20.

On April 2, 2001, DuPont issued a memorandum announcing a global reduction-in-force ("RIF") of its employees and contract workers ("April 2, 2001 Memorandum"). Grasso Declaration Exh. G.  Worldwide, DuPont planned to eliminate 4000, or 4% of its employees and 1300 contract personnel, with 75% of the reductions occurring in the United States, and to shut down less competitive manufacturing assets.  April 2, 2001 Memorandum at 1.  On April 29, 2002, DuPont's Niagara Falls Plant Manager Kelly W. Kober ("Kober") issued a memorandum ("April 29, 2002 Memorandum"), Grasso Declaration Exh. H, announcing DuPont's decision to discontinue producing Terathane at the Niagara Falls Plant and to restructure the Sodium and Lithium manufacturing area ("the Sodium area"), resulting in the elimination of 172 positions at the Niagara Falls Plant.  Although McLellan was initially advised that, in connection with the RIF, he would be laid off in Spring 2002, Plaintiff continued to work as part of the RIF for another year, during which McLellan was assigned to a project dismantling and demolishing the Terathane operations ("the Terathane Project"), a different manufacturing activity at the Niagara Falls Plant.

While assigned to the Terathane Project, McLellan worked with another CFC, Larry Edwards ("Edwards"), a direct DuPont employee who was then 45 years old.  On June 5, 2003, DuPont informed Adecco that McLellan's services were no longer needed as the Terathane Project was complete, and McLellan's work at the Niagara Falls Plant would end on June 27, 2003.  Adecco communicated this information to McLellan. McLellan's last day of work at DuPont's Niagara Falls Plant was June 28, 2003, and Edwards was terminated at the same time for the same reason.  While McLellan was

assigned to the Terathane Project, his previous CFC duties in the Sodium area were performed by Douglas Potter ("Potter"), a direct DuPont employee, and James Cody ("Cody"), a contract employee who worked as a mechanical designer.[11]  Neither Potter nor Cody was terminated with McLellan and Edwards.

Following termination, McLellan, through his attorney, Donohue, by letter dated December 5, 2003 ("December 5, 2003 Letter"), requested DuPont provide Plan documents relevant to McLellan's service at DuPont since 1962.  Plaintiff's Exh. I at 1. By letter dated December 18, 2003 ("December 18, 2003 Letter"), Victoria Gibbs ("Gibbs"), a senior paralegal in DuPont's legal department, acknowledged receipt of the December 5, 2003 Letter, and advised Donohue that after "diligently searching" DuPont's records, she had determined that McLellan was never a "full-service employee" of Dupont and, thus, DuPont had no records on McLellan.  Plaintiff's Exh. I at 2.  In response to the December 18, 2003 Letter, Donohue, by letter dated December 22, 2003 ("December 22, 2003 Letter"), advised Gibbs that McLellan was a "direct employee of DuPont from 1962 to 1971[12] and was an employee as that term is defined in the ERISA statute and *Nationwide v. Darden*, 503 U.S. 318 (1992) [(hereinafter "*Darden*")], from 1997 to 2003, though [McLellan] was paid by Adecco."  Plaintiff's Exh. I at 3.  Donohue further advised that the failure to furnish the requested Plan documents prevented McLellan from ascertaining how the term "full-service employee" was defined

---

[11] The record does not specify the employment agency, if any, through which Cody obtained his contract position with DuPont.

[12] Despite the discrepancy as to the exact dates of McLellan's first employment period with DuPont, *see* Facts, *supra*, n. 3, Defendants do not contend that such discrepancy prevented the Plan Administrator from ascertaining whether McLellan has, in fact, previously been employed by DuPont.

by the Plan and, thus, prevented McLellan from exhausting remedies under the Plan.
*Id*.  In concluding the December 22, 2003 Letter, Donohue advised that legal action
would be commenced to determine the issue as well as what statutory penalties were
applicable.  *Id*.  DuPont never furnished the Plan documents in response to the
requests; rather, the Plan documents were provided on January 6, 2005 in connection
with discovery in the instant action.


## DISCUSSION

### 1.      Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party
demonstrates that there are no genuine issues as to any material fact and that a moving
party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is
required to construe the evidence in the light most favorable to the non-moving party.
*Tenenbaum v. Williams*, 193 F.3d 58, 59 (2d Cir. 1999) (citing *Anderson, supra*, at 255).
The party moving for summary judgment bears the burden of establishing the
nonexistence of any genuine issue of material fact and if there is any evidence in the
record based upon any source from which a reasonable inference in the non-moving
party's favor may be drawn, a moving party cannot obtain a summary judgment.
*Celotex, supra*, 477 U.S. at 322; *see Anderson, supra*, 477 U.S. at 247-48 ("summary
judgment will not lie if the dispute about a material fact is "genuine," that is, if the
evidence is such that a reasonable jury could return a verdict for the nonmoving party").

In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner*, *supra*, 930 F.2d at 209.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, 477 U.S. at 323-24 (1986) (quoting Fed. R. Civ. P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P.

56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"However, if the motion for summary judgment is not made and supported as provided in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own."  *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (reversing granting of summary judgment in favor of defendant because defendant failed to allege factual basis for assertions contained in defendant's affidavit such that plaintiff, as the party opposing summary judgment, was not required to adduce evidence to defeat summary judgment and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the statements, rather than to their admissibility).

In the instant case, McLellan seeks partial summary judgment on the Second Cause of Action seeking an award of a civil penalty against DuPont for failing to furnish McLellan with requested Plan documents in the amount of $ 100 for each day of the alleged violation.  Defendants seek summary judgment of the action in its entirety, arguing the First Cause of Action fails to state a claim and is time-barred, and the Second, Fourth and Fifth Causes of Action are without any factual support.

**2.    ERISA Claims**

McLellan originally asserted three claims under ERISA, including (1) interference with vesting by refusing to rehire in violation of ERISA § 510, 29 U.S.C. § 1410; (2) refusal to provide McLellan with requested Plan documents in violation of ERISA § 502, 29 U.S.C. § 1132(c)(1)(B); and (3) a substantive claim that Defendants refused to recognize McLellan as a DuPont employee entitled to Plan benefits in violation of ERISA § 502, 29 U.S.C. § 1132(a)(1)(B).  As stated, however, pursuant to stipulation, McLellan withdrew his Third Cause of Action under 29 U.S.C. § 1132(c)(1)(B), without prejudice and, thus, only the first and second ERISA claims remain in the action.  Given ERISA's complex nature and the numerous issues common to the First and Second Causes of Action, to facilitate analysis of the issues presented on the instant motions, the court first discusses basic ERISA provisions relevant to both claims.

ERISA was enacted "to . . . protect the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans. . . ."  29 U.S.C. § 1001(c).  In enacting ERISA, Congress intended "to protect contractually defined benefits," *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 112 (1989) (hereinafter "*Firestone*"), and to ensure that "if a worker has been promised a defined pension benefit upon retirement - and if he has fulfilled whatever conditions are required to obtain a vested benefit - he actually will receive it." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375 (1980). Nevertheless, "ERISA does not require that a worker be offered any particular retirement benefits."  *Laniok v. Advisory Committee of the Brainerd Manufacturing Company Pension Plan*, 935 F.2d 1360, 1365 (2d Cir. 1991).  "Although the Congress that enacted ERISA sought to improve the equitable character of private retirement

plans and to encourage increased participation in them, it also recognized that such

plans were voluntary on the part of the employer." *Laniok*, *supra*, at 1365 (citing H.R.

Rep. No. 533, 93rd Cong., 1st Sess. 1-2 (1973), *reprinted in* 1974 U.S. Code Cong. &

Admin. News 4639, 4639-40; S. Rep. No. 383 (93rd Cong. 1st Sess. 1 (1973), *reprinted*

*in* 1974 U.S. Code Cong. & Admin. News 4890, 4890).  "ERISA does not require all

eligible individuals to participate in a plan," nor is there any ERISA provision "generally

prohibiting an individual from waiving his right to participate in a pension plan."[13]  *Laniok*,

*supra*, at 1364-65.  Nevertheless, as to any plan participant who has accrued benefits in

an ERISA-covered retirement plan, ERISA § 204(g), codified as 29 U.S.C. § 1054(g) ("§

1054(g)"), in tandem with Internal Revenue Code (I.R.C.) § 411(d)(6) ("the anti-cutback

provision"), prohibits amendments to pension plans which diminish the accrued benefits

of the participants.  *Perreca v. Gluck*, 295 F.3d 215, 227-28 (2d Cir. 2002).

Generally, "'unambiguous language in an ERISA plan must be interpreted and

enforced in accordance with its plain meaning.'"  *Perreca*, *supra*, 295 F.32d at 223

(quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 149 (2d Cir.

1999)).  *See also Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) ("This

Court will review the [ERISA] Plan as a whole, giving terms their plain meaning.")

(bracketed text added).  Further, "absent evidence indicating the intention of the parties,

any ambiguity in the language used in an ERISA plan should be construed against the

interest of the party that drafted the language."  *Perreca*, *supra*, at 223 (citing *O'Neil v.*

---

[13] In the instant case, it is undisputed that DuPont never had McLellan sign any waiver with regard to any rights that McLellan, based on either his first employment period from 1963 to 1972, or resulting from his second employment period from 1997 to 2003, may have to DuPont's ERISA-covered benefits under the Plan.

*Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir. 1994) (stating in context of ERISA action "[t]he rule is that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." (internal quotation marks omitted)).  *See also Fay*, *supra*, 287 F.3d at 104 ("Where there are ambiguities in an ERISA plan that this court is reviewing *de novo*, those ambiguities are construed in favor of the plan beneficiary.").  Additionally, "it is also a 'cardinal principle of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other.'"  *Perreca*, *supra*, at 224 (quoting *Mastrobuono v. Shearson Lehman Hutton*, Inc., 514 U.S. 52, 63 (1995), and observing that the plaintiff's interpretation of the subject ERISA plan would require the defendant company to pay into two pension plans, including a union plan and a company plan, for the same set of years for any given employee, which was not the plan's intent)).

"ERISA requires that the participant and beneficiaries of any employee benefit plan be provided with a summary plan description ("SPD"), a thorough and easy to understand summary of the benefit plan."  *Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001) (quoting 29 U.S.C. § 1022(a)).  "The SPD must be 'written in a manner calculated to be understood by the average plan participant' and must 'be sufficiently accurate and comprehensive to apprise such participants and beneficiaries of their rights and obligations under the plan.'"  *Layaou*, *supra*.  Further, ERISA contemplates that the SPD "will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary."  *Layaou*, *supra* (quoting *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08

18

(2d Cir. 1990)).  In fact, "the SPD is of such importance that 'where the terms of a [benefit] plan and the SPD conflict, the SPD controls.'" *Frommert v. Conkright*, 433 F.3d 254, 265 (2d Cir. 2006) (quoting *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003)).

ERISA also provides "'a panoply of remedial devices' for participants and beneficiaries of benefit plans." *Firestone*, *supra*, 489 U.S. at 108 (quoting *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)).  The specific remedial devices at issue in the instant case are ERISA §§ 502 and 510 which, respectively, provide for relief against the administrator of an ERISA-covered plan who refuses to comply with a plan participant's request for plan documentation (§ 502(c), 29 U.S.C. § 1132), and against an employer who interferes with a participant's attaining benefits to which the participant otherwise would be entitled pursuant to the terms of an employer's ERISA-covered plan (§ 510, 29 U.S.C. § 1140).  The Second Circuit has held that "'cases involving ERISA benefits are inherently equitable in nature, not contractual, and that no right to jury trial attaches to such claims.'" *Tischmann v. ITT/Sheraton Corporation*, 145 F.3d 561, 568 (2d Cir. 1998) (quoting *DeFelize v. American Int'l Life Assurance Co. of New York*, 112 F.3d 61, 64 (2d Cir. 1997) (citing *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1258-59 (2d Cir. 1996))).

Although "ERISA does not govern 'any cause of action which arose, or any act or omission which occurred, before January 1, 1975,'" ERISA's effective date, *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1186 (2d Cir. 1996) (quoting 29 U.S.C. § 1144(b)(1)), in the instant case, McLellan's claims arise from DuPont's alleged refusal both to rehire him as a direct DuPont employee in January 1997 so as to

19

interfere with McLellan's attaining a right to benefits under the Plan, and to provide

McLellan with Plan documents in response to the December 5 and 22, 2003 Letters

requesting the documents.  Therefore, as McLellan's First and Second Causes of Action

are based on DuPont's alleged conduct occurring after 1975, the claims arise under

ERISA.

The relevant portions of ERISA governing civil enforcement provide that

(a) A civil action may be brought –
    (1) by a participant or beneficiary –
* * *
        (B) to recover benefits due to him under the terms of his plan, to
        enforce his rights under the terms of the plan, or to clarify his rights
        to future benefits under the plan;
* * *
[or]
        (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or
        practice which violates any provision of this title or the terms of the plan, or
        (B) to obtain other appropriate equitable relief (i) to redress such violations
        or (ii) to enforce any provisions of this title or the terms of the plan; . . . .

29 U.S.C. § 1132(a)(1)(B) & (a)(3).

Crucial to the analysis of McLellan's ERISA claims is how ERISA defines several terms

including "employer," "employee," and "participant."[14]  In particular, "employer" is defined

as "any person acting directly as an employer, or indirectly in the interests of an

employer, in relation to an employee benefit plan, . . ." 29 U.S.C. § 1002(5), whereas

an "employee" is defined as "any individual employed by an employer."  29 U.S.C. §

1002(6).  A plan "participant" is defined as "any employee or former employee of an

employer, . . . who is or may become eligible to receive a benefit of any type from an

---

[14] That McLellan, as a former DuPont employee based on his service between 1963 and 1972, asserts he qualifies, for purposes of ERISA, as a plan "participant" rather than as a plan "beneficiary," is undisputed.

employee benefit plan which covers employees of such employer . . . or whose beneficiaries may be eligible to receive any such benefit."  29 U.S.C. § 1002(7).

## A.   Common Law Employee

"The definition of employee under ERISA provides little guidance in determining who should be included within its scope."  *Renda v. Adam Meldrum & Anderson Co.*, 806 F.Supp. 1071, 1077 (W.D.N.Y. 1992).  In the instant case, the absence of such statutory guidance is significant insofar as the parties concede that when McLellan was hired for the CFC position in 1997, he was hired through Adecco to work for DuPont as a "leased employee," rather than as DuPont's "direct employee."[15]  Whether McLellan was a direct or leased employee of DuPont, however, does not prohibit a conclusion that McLellan was DuPont's common law employee.  *See Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 232 (2d Cir. 1995) (citing *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993) (holding that the employment status of an individual, characterized in employment consultant agreement as an "independent contractor" is not, for ERISA

---

[15] The parties use the terms "leased employee" and "direct employee" to distinguish between a worker who, like McLellan, was not directly hired by DuPont but, rather, was hired through a third party, *i.e.*, Adecco, to render services to DuPont.  Although the parties do not explain the origin of such terms, the court's research has revealed that the term "leased employee" is taken from an Internal Revenue Code ("IRC") provision entitled "Employee leasing" pertaining to the taxation of deferred compensation plans, including pension plans.  26 U.S.C. § 414(n)(2).  To paraphrase, a "leased employee" is defined as a worker who, although not an employee of the employer, has, for at least one year, rendered to the employer pursuant to an agreement between the employer and a third party leasing organization, services of a type historically performed in the employer's business field.  26 U.S.C. § 414(n)(2).  After one year, such a leased employee is considered, for purposes of a deferred compensation plan, an employee of the employer.  26 U.S.C. § 414(n)(1).  In contrast, by implication, a "direct employee" would be any person who is hired by and renders services to the employer in the absence of any agreement between the employer and any other person or third party.  Nothing within the IRC, however, prohibits an employer from excluding leased employees from eligibility for benefits, including pensions, under an employer-sponsored ERISA-covered plan.

purposes, determined solely by the label used in a contract between the parties), and *In re Shulman Transp. Enters. Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) (under agency principles, an "employee does not become an independent contractor simply because a contract describes him as such.")).   Nor does the fact that an individual is, for income tax purposes, considered to be self-employed in his own business dispositive under the common law agency test.   *Sharkey*, *supra*, at 232 ("the corporate form under which [the plaintiff] did business is not dispositive under the common-law agency test") (bracketed text added).   Rather, a worker's "[e]mployment status [for ERISA purposes] depends on all of the factual incidents of the relationship."   *Id*. (citing *Darden*, *supra*, 503 U.S. at 324) (bracketed text added).

The Supreme Court has recognized

ERISA's nominal definition of "employee" as "any individual employed by an employer," 29 U.S.C. § 1002(6), is completely circular and explains nothing . . . [nor is there elsewhere within ERISA] any provision either giving specific guidance on the term's meaning or suggesting that construing it to incorporate traditional agency law principles would thwart the congressional design or lead to absurd results.

*Darden*, *supra*, 503 U.S. at 323.

In light of Congress's failure to supply a specific definition for the term "employee" within ERISA, the Supreme Court adopted "a common-law test for determining who qualifies as an 'employee' under ERISA," which "incorporate[s] 'the general common law of agency, rather than . . . the law of any particular State.'" *Darden*, *supra*, 503 U.S. at 323 & n. 3 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)).   Specifically,

"[i]n determining whether a hired party is an employee under the general common law of agency, we consider [1] the hiring party's right to control the

22

> manner and means by which the product [of the hired party's rendered services] is accomplished.  Among the other factors relevant to this inquiry are [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party."

*Darden*, *supra*, at 323-24 (quoting *Reid*, *supra*, at 751-52) (bracketed enumerations added).

In considering the so-called *Reid* factors,[16] "[t]he 'greatest emphasis' should be placed . . . on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks."  *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (citing *Frankel v. Bally*, 987 F.2d 86, 89 (2d Cir. 1993)).  "The first factor is entitled to this added weight because, under the common law of agency, 'an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and 'the manner and means' by which the purported employee brings about that result.'"  *Eisenberg*, *supra*, at 114 (quoting *Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 320 (2d Cir. 1980)).

In determining whether a worker is a common law employee and, *a fortiorari*, the employee of the relevant employer, the presence or absence of each of the *Reid* factors is a question of fact.  *Eisenberg*, *supra*, 237 F.3d at 115.  In an ERISA action, the

---

[16] Although some district courts within the Second Circuit have referred to the "*Reid* factors" as the "*Darden* factors", *see e.g.*, *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 321 (S.D.N.Y. 2001), cases from the Second Circuit Court of Appeals refers only to "*Reid* factors."  *See e.g.*, *Gulino v. New York State Educ. Dept.*, __ F.3d __,  2006 WL 2380829, * 7-8 (2d Cir. Aug. 17, 2006); and *Sharkey*, *supra*, 70 F.3d at 231.

"ultimate determination" as to whether a worker is a common law employee is, however,

a question of law to be determined by the district court.  *Id*.

In addition to the *Reid* factors, the "Definitions and special rules" section of the

IRC, 26 U.S.C. § 414 "supplies additional guidance regarding the definition of

'employee' and its construction with regard to lease departments," in evaluating a claim

under ERISA, *Renda*, *supra*, 806 F.Supp. at 1078, as follows.

> § 414 Definitions and special rules . . .
> (n) Employee leasing. -
> (1) In General. - For purposes of the requirements listed in paragraph (3),
> with respect to any person (hereinafter in this subsection referred to as
> 'the recipient') for whom a leased employee performs services-
>> (A) the leased employee shall be treated as an employee of the
>> recipient . . .
> (2) Leased employee- For purposes of paragraph (1), the term 'leased
> employee' means any person who is not an employee of the recipient and
> who provides services to the recipient if --
>> (A) such services are provided pursuant to an agreement between
>> the recipient and any other person (in this subsection referred to as
>> the "leasing organization"),
>> (B) such person has performed such services for the recipient (or
>> for the recipient and related persons) on a substantially full-time
>> basis for a period of at least 1 year, and
>> (C) such services are performed under primary direction or control
>> by the recipient.
> (3) Requirements.- For purposes of this subsection, the requirements
> listed in this paragraph are . . . (A) paragraphs (3), (4), (7), (16), (17), and
> (26) of section 401(a) (26 U.S.C. § 401(a)] . . . "

26 U.S.C. § 414(n).[17]

"The gist of these sections, taken together, is that individuals who perform

services 1) pursuant to an agreement between the recipient and a leasing organization,

---

[17] As stated, Facts, *supra*, at 7, in the instant case, the Preamble to the 1996 Plan Amendment specifies that the Plan "is intended to be a defined benefit plan" under IRC § 401(a) and to satisfy ERISA requirements.  1996 Amended Plan (Plaintiff's Exh. G) at 2.

2) on a full-time basis for at least one year, and 3) of a type historically performed by employees for the recipient of those services in that business field, are to be considered employees of the recipient of those services.  The question of whether the leased employee provides services for the leasing organization may be answered by looking to the same criteria used to define a common-law employee." *Renda*, *supra*, 806 F.Supp. at 1078.  Furthermore, IRC § 414 is relevant not only because the tax treatment of a specific worker "is a factor in identifying a common-law employee under *Nationwide* [*Darden*], but also because an individual who does not merit employee status may still be considered an employee for purposes of certain sections of the IRC and, by reference, related ERISA provisions under its scope." *Renda*, *supra*, at 1078 & n. 5 (observing that IRC § 414 is intended to provide guidance in applying various treasury department regulations to the minimum participation, vesting and funding requirements of both the IRC and ERISA, and noting 26 U.S.C. § 414(o), providing the Treasury Secretary "shall prescribe such regulations . . . as may be necessary to prevent the avoidance of any employee benefit requirement listed in subsection . . .(n)(3) [of IRC § 414] . . . through the use of (2) employee leasing," indicates that "Congress recognized the potential for abuse by employers, who could attempt to avoid the pension plan requirements of Title 26 by using lease arrangements.").  As such, the identification and treatment of a leased employee with regard to an ERISA-covered benefit plan "is governed by the common-law definition of an employee <u>and</u> the definition provided by § 414(n). . . ." *Renda*, *supra*, at 1079 (underlining added).

Although the parties to this action have not discussed whether McLellan was, according to the *Reid* factors and IRC § 414(n), a common law DuPont employee, a

cursory review of the undisputed evidence submitted by McLellan in connection with the instant summary judgment motions points to an objective finding that McLellan was, in fact, a common law DuPont employee.  In particular, the offer of employment for the CFC position was made by DuPont engineer Keppler.  First McLellan Affidavit ¶ 6. Upon commencing his second employment period with DuPont, McLellan was supervised by a DuPont Maintenance Manager named Lee Evert who was authorized to control the manner and means by which McLellan performed the CFC position.  *Id*. ¶ 10.  DuPont exercised a substantial amount of control over McLellan, who was subject to the same rules and policies of direct DuPont employees.  *Id*. ¶ 10.  The work of the CFC position McLellan held as a leased employee was also performed by at least one direct DuPont employee, Potter.  Plaintiff's Response to Defendants First Set of Interrogatories[18] ¶ 16.  DuPont was the source of the instrumentalities and tools used by McLellan during his employment at the Niagara Falls Plant, the sole location of McLellan's work.  First McLellan Affidavit ¶ 12.  In connection with the CFC position, McLellan supervised and directed DuPont employees and contractors.  *Id*. ¶ 19. Although not involved in the hiring and paying his own assistants, McLellan was directly involved in approving payments by DuPont to outside contractors.  *Id.* ¶ 18.  After completing the initial project for which McLellan was hired as a DuPont CFC, McLellan was not terminated but, rather, assigned by DuPont to other projects at the Niagara Falls Plant such that McLellan continually rendered services to DuPont from January 1997 until June 2003 when DuPont, not Adecco, made the decision to terminate

---

[18] Grasso Declaration Exh. I.

McLellan. *Id*. ¶¶ 14-15.  During this period, McLellan was also added to DuPont's e-mail system, assigned a DuPont telephone number and given an office rather than a cubicle at DuPont's Niagara Falls Plant, and attended, at DuPont's expense, computer training and safety seminars with DuPont employees. *Id*. ¶¶ 12-13.  Although Adecco supplied McLellan's regular paychecks for the services McLellan rendered to DuPont, McLellan received bonuses and disbursement reimbursements directly from DuPont. *Id*. ¶¶ 17, 21.  DuPont set McLellan's regular work hours and occasionally mandated overtime. *Id*. ¶ 16.

Other evidence in the record provided by Defendants in response to McLellan's discovery requests, demonstrates that DuPont management received training regarding conduct that could result in leased employees being considered employees for purposes of eligibility for ERISA-covered benefits under the Plan. *See* Donohue Response Affirmation ¶ 7 and attached Exhibit ("Management Training Exhibit").  The evidence shows that at "Co-Employment/Co-Management Training in July 2001, DuPont's management was advised that courts had found "independent contractors" and "temporary agency employees" were employees entitled to employee benefits. Management Training Exhibit at 4-5.  In particular, DuPont's management was informed that whether leased employees could be considered employees for purposes of establishing eligibility to benefits depended on "the right to exercise sufficient control over the activities" of such workers, "including the setting of wages, benefits, hours, or working conditions . . . ."  Management Training Exhibit at 6.  Further the "[f]ocus is typically on whether [a] user of services has sufficiently injected itself into direct control of worker's day-to-day activities and/or has otherwise injected itself into workers'

27

employment relationship with 'real' employer." *Id*. at 7 (bracketed text added).   A list of

20 factors used by the IRS to determine "control" was presented which included, *inter*

*alia*, who instructs the worker as to when, where and manner of work, integration of the

worker into the company's operations, training provided to the worker by the company,

hiring, supervising and payment of the worker's assistants' wages by the company, full-

time hours required of the worker for the company, whether the work is to be performed

on company's premises, regular hourly, weekly or monthly payment rather than by

project, company's payment of the worker's business or traveling expenses, company's

provision of the worker's tools and materials, no significant investment required by the

worker, company able to discharge the worker without penalty, and the worker does not

work for more than one company nor make services available to the general public. *Id*.

at 8-10.   Significantly, the training program materials specifically advise against a

company getting involved in the day-to-day supervision of contract employees, the

hiring, disciplining or firing of contractual employees, setting wages, benefits and reward

programs, and including contract employees in company reward programs.   *Id*. at 15-

16.   The materials also advise providing for separate employee/contractor identification

and sign-in procedures, separate entrances and exits, and separate office areas.   *Id*. at

17.

        As discussed above, Discussion, *supra*, at 26-27, the evidence demonstrates

that DuPont did not follow many of these suggestions with regard to McLellan's second

period of employment.   Furthermore, McLellan meets the IRC's definition of a leased

employee who, for purposes of § 401(a) defined benefit plans, is to be treated as a

DuPont employee.   26 U.S.C. § 414(n)(1)(A) (leased-employee "shall be treated as

employee of recipient," *i.e.*, DuPont).

Nevertheless, the court need not rely solely on the *Reid* factors and IRC § 414(n) to conclude that McLellan is a common law DuPont employee because Defendants have conceded the point at least twice.[19]  First, Defendants concede McLellan meets the definition of an employee for the purposes of McLellan's ADEA claim.  Defendants' Memorandum at 14 ("For purposes of this motion only, DuPont does not contest that [McLellan] meets the definition of an employee under the ADEA . . . .").  When McLellan construed such statement as conceding McLellan is a common law DuPont employee for ERISA purposes, Plaintiff's Response at 3, Defendants, in further support of summary judgment, denied having conceded the issue, asserting that Defendants "have merely stated that for the purposes of their motion they do not contest plaintiff's employment status under the Age Discrimination in Employment Act."  Defendants' Reply at 2.

The issue on a summary judgment motion, however, is one of evidence and the existence of facts justifying trial rather than, as Defendants presume, merely asserting alternative theories of liability or defense as a matter of pleading, and therefore a statement made in pursuit of summary judgment may be considered a "'judicial admission,' *i.e.*, a representation that 'unless allowed by the court to be withdrawn, is conclusive in the case.'"  *Meyer v. Berkshire Life Insurance Co.*, 372 F.3d 261, 264 (4th Cir. 2004) (quoting *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir, 1995)).

---

[19] That McLellan is a common law employee for ERISA purposes is highly relevant to the Third Cause of Action under 29 U.S.C. § 1132(a)(1)(B), asserted against the Plan for payment of pension benefits.  Complaint ¶¶ 30-34.  McLellan, however, has withdrawn such claim without prejudice and, as such, the claim, presently, is not before the court.

Significantly, judicial admissions "include intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law." *Meyer*, *supra*, at 264-65.  In *Meyer*, *supra*, the defendant, in moving for summary judgment, waived its previously asserted argument contesting defendant's alleged fiduciary status, so as to permit the action to proceed under ERISA, which preempted state common law claims for negligence and breach of fiduciary duty, thereby supporting the defendant's removal of the action to federal district court.  *Id*. at 263-64.  The district court implicitly construed the defendant's waiver, made in connection with summary judgment, as a judicial admission and refused to permit the defendant, at trial and through new counsel, to "'recast' the scope of its waiver." *Id*. at 264.  Additionally, it is within the court's discretion to construe a defendant's waiver of a legal defense "as a judicial admission in a manner that effectuates the strategic purpose for which the court reasonably believes the waiver was made."  *Id*. at 265-66 (observing that the defendant intended its concession as to its fiduciary status be treated "*as a means to broadly preempt the four common law claims*" alleging the defendant mismanaged the plaintiffs' pension plans so as to support removal of the action to District Court) (italics in original).  Similarly, in the instant case, Defendants' concession as to McLellan's status as a common law DuPont employee for purposes of McLellan's ADEA claims cannot be evaded in evaluating the merits of Defendants' request for summary judgment on McLellan's ERISA claims.  Defendants further overlook their second concession of McLellan's common law employee status.

Specifically, Defendants, in support of summary judgment on the First Cause of Action, construe McLellan's allegation that DuPont employed McLellan through Adecco,

a temporary employment agency, to prevent McLellan from attaining entitlement to

ERISA-covered benefits, including pension plan benefits under the Plan, as well as

other benefits DuPont offered its employees, in violation of ERISA § 510, 29 U.S.C. §

1140, Complaint ¶¶ 23-26, McLellan's First Cause of Action, as alleging that DuPont

intentionally "misclassified" McLellan as a leased employee so as to render McLellan

ineligible for pension benefits.  Defendants' Memorandum at 6-8.  By relying on their

"misclassification" argument, however, Defendants impliedly concede that McLellan is,

in fact, a common law DuPont employee.  *See Cameron v. Community Aid for Retarded*

*Children, Inc.*, 335 F.3d 60, 64 (2d Cir. 2003) (plaintiff's factual assertions, inherently

inconsistent with plaintiff's theory of liability, supported finding plaintiff conceded

absence of any factual basis for defendant's liability).[20]  Simply put, if McLellan were not

DuPont's employee, it would not have been possible for DuPont to "misclassify" him for

any employment purpose including, in particular, as a "leased employee."  Significantly,

DuPont does not contend McLellan was an independent contractor.  Thus, to obtain

summary judgment on McLellan's First Cause of Action by advancing their

"misclassification" theory, Defendants have constructed a defensive strategy dependent

upon McLellan's status as a common law employee.  *See Meyer*, *supra*, 372 F.3d at

265-66.  As such, McLellan's status as a common law DuPont employee is established

---

[20] In *Cameron*, *supra*, the plaintiff, in an attempt to establish a *prima facie* case of disability-based employment discrimination, asserted that defendant employer rejected two requested accommodations for plaintiff's alleged anxiety disorder, the predicate for the claim, including that the employer bar a certain subordinate of the plaintiff from entering the building in which the plaintiff worked or, alternatively, that the plaintiff be permitted to leave the building when the subject employee entered, thereby conceding the plaintiff's inability to get along with the subordinate employee, with whom the plaintiff was charged with supervising, and thus established the plaintiff was unqualified for the supervisory position from which she had been discharged.  *Cameron*, *supra*, 335 F.3d at 64.

for the purposes of the instant motions in this action.


**B.      Standing**

Defendants argue that McLellan lacks standing to pursue his ERISA claims

because McLellan, as a leased employee, does not qualify as a Plan participant.

Defendants' Reply at 1.  Defendants raise the standing issue for the first time in their

reply papers submitted in further support of summary judgment.  Defendants' Reply at

1-3.  As such, McLellan has not responded to this argument.  Nevertheless, as the

standing issue is jurisdictional, the court addresses it *sua sponte*.  *See Central States*

*Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed*

*Care, L.L.C.*, 433 F.3d 181, 197 (2d Cir. 2005) ("Because the standing issue goes to the

court's subject matter jurisdiction, it can be raised *sua sponte*.").

"The term 'standing' subsumes a blend of constitutional requirements and

prudential considerations. . . ."  *Financial Institutions Retirement Fund v. Office of Thrift*

*Supervision*, 964 F.2d 142, 147 (2d Cir. 1992) (hereinafter "*Fin. Inst. Ret. Fund*") (citing

*Valley Forge Christian College v. Americans United for Separation of Church and State,*

*Inc.*, 454 U.S. 464, 471 (1982)).  *See also Warth v. Sedlin*, 422 U.S. 490, 498 (1975)

(Standing "involves both constitutional limitations on federal-court jurisdiction and

prudential limitations on its exercise").  The Supreme Court has articulated "three

requirements for establishing Article III standing, including '[a] plaintiff must allege [1]

personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3]

likely to be redressed by the requested relief.'" *Fin. Inst. Ret. Fund*, *supra* (quoting *Allen*

*v. Wright*, 468 U.S. 737, 751 (1984)) (bracketed text in original).  The Supreme Court

"has also articulated a closely related set of prudential principles that limit the circumstances under which federal courts may exercise their jurisdiction." *Fin. Inst. Ret. Fund*, *supra* (citing *Warth*, *supra*, at 499-500). Nevertheless, "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Warth*, *supra*, at 501 (internal quotation marks omitted). In the instant case, the court need not consider "the prudential contours of the standing doctrine" because Congress, in enacting ERISA, "[overrode] prudential limits by statute." *Fin. Inst. Ret. Fund*, *supra* (citing *Warth*, *supra*, at 501). As such, McLellan need not demonstrate prudential standing to pursue his First or Second Causes of Action.

Alternatively, if McLellan were required to demonstrate prudential standing, that McLellan had previously worked for DuPont and, if credited with his previous years of service from his first employment period, upon rehire as a common law DuPont employee, vested in the Plan upon being compensated for 1,000 hours of service within one year of the date of such reemployment, 1996 Amended Plan § IX.A(3)(a)(iii), is essential to whether McLellan can demonstrate he is a "participant" as defined under ERISA so as to have standing to pursue a § 510 action.

With regard to ERISA's definition of a "participant" as "any employee or former employee . . . who is or may become eligible to receive a benefit from an employee benefit plan," 29 U.S.C. § 1002(7), the Supreme Court has stated that "the term 'participant' is naturally read to mean either employees in, or reasonably expected to be in, currently covered employment, . . . or former employees who have . . . a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone*, *supra*, 489 U.S. at 117 (citing cases, internal quotation marks

omitted and italics added).  Further, "[i]n order to establish that he or she 'may become

eligible' for benefits, a claimant must have a colorable claim that (1) he or she will

prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the

future."  *Id*. at 117-18.  *See Laniok*, *supra*, 935 F.2d at 1364 (observing the Supreme

Court's construction of the language of 29 U.S.C. § 1002(7) "as including former

employees 'who have a colorable claim to vested benefits,' because such claimants

'may become eligible' within the meaning of the statute by prevailing in a suit for

benefits." (quoting *Firestone*, *supra*)).

The test for standing to bring a claim under ERISA, including McLellan's First and

Second Causes of Action, has been articulated as having two prongs, including (1) the

plaintiff must be an employee; and (2) according to the language of the subject ERISA-

covered plan, the plaintiff must be eligible to receive a benefit under the plan.  *Bauer v.*

*Summit Bancorp.*, 325 F.3d 155, 160 (3d Cir. 2003).[21]  The first prong is satisfied if the

---

[21] The Third Circuit's holding in *Bauer* regarding standing is contrary to the Third Circuit's earlier decision in *Becker v. Mack Trucks, Inc.*, 281 F.3d 372 (3d Cir.), *cert. denied*, 537 U.S. 818 (2002), where the defendant employer, based on an economic downturn, closed a facility, resulting in the termination of numerous employees, some of whom were laid off and whose recall rights under the collective bargaining agreement ("CBA") in place were eventually exhausted without such employees having been recalled. *Becker*, *supra*, at 376-77.  When the defendant company's financial position subsequently improved and additional employees were hired, the defendant intentionally instituted a policy not to rehire former employees, either with or without vested pension rights, so as to avoid incurring increased pension benefit liabilities.  *Id*.

In *Becker*, *supra*, the Third Circuit held that those plaintiffs who had not yet vested in the defendant company's pension plan upon their termination, and whose recall rights under the then operative CBA had expired, had no standing to pursue a § 510 claim because "the non-vested plaintiffs lack a reasonable expectation of returning to covered employment," given that their recall rights under the CBA had either expired or been waived in return for dislocation benefits.  *Becker*, *supra*, 281 F.3d at 377-78.  Nor did the non-vested plaintiffs' argument to support standing persuade the court that "but for" the defendant company's refusal to rehire them, the non-vested plaintiffs would have vested in the company's pension plan.  Rather, the court held that "the 'but for' analysis grants standing only when the employer's action 'in and of itself divests aggrieved parties of their status as covered employees.'" *Becker*, *supra*, at 378 (quoting *Shawley v. Bethlehem Steel Corp.*, 989 F.2d 652, 658-59 (3rd Cir. 1993)).  Because the key fact upon which the plaintiffs in *Becker* relied was one beyond the defendant's control, no standing existed according to the court's analysis.

Nowhere within the text of *Bauer* is there any attempt either to factually distinguish *Becker* from

plaintiff can establish he is a common law employee.  *Bauer*, *supra*.  In the instant case,

McLellan's status as a common law DuPont employee has been established by

DuPont's concessions, Discussion, *supra*, at 29-32, if not by application of the *Reid*

factors and IRC § 414(n), so as to satisfy the first prong necessary under the *Bauer* test

for ERISA standing for McLellan to bring the instant ERISA claims.

As to the second prong, in the instant case, McLellan has a "colorable claim to

benefits" under the Plan, *Firestone*, *supra*, 489 U.S. at 117, such that it is highly likely

that McLellan is eligible to receive a benefit under the plan.[22]  According to the version

of the Plan in effect throughout McLellan's second employment period at DuPont, albeit

through Adecco, eligibility for a vested right to a deferred pension under the plan

accrues when an employee "has had at least five years of service."  1996 Amended

Plan § V(A)(1).  According to the Plan, "[t]he term 'employee' . . . includes all employees

of the Company [DuPont]."  1996 Amended Plan § IX.A(1)(a) (bracketed text added).

The Plan contains several categories of workers who are excluded from accruing a

vested interest in a deferred pension, among which are "individuals who must be treated

as employees of the company for limited purposes under the 'leased employee'

---

*Bauer*, or to reconcile the different approaches to the standing question so as to explain the different standing analysis.  Nevertheless, *Bauer's* statement of the standing test is more consistent with *Firestone's* instruction to consider whether the plaintiff has a "colorable claim to vested benefits." *Firestone*, *supra*, 489 U.S. at 117.  Specifically, the defendant's responsibility for actions tending to prevent a plaintiff from achieving participant status is not among the factors relevant to establish standing under ERISA.  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 101 (2d Cir. 2005) (observing that a plan participant can lose standing to sue if, despite suffering an ERISA violation, the employee is terminated in a downsizing, thereby losing participant status, prior to the commencement of legal action.

[22] Because the issue as to whether McLellan is, in fact, eligible for pension benefits under the Plan is not presently before the court in light of McLellan having withdrawn, without prejudice, the Third Cause of Action, any such determination is relevant with regard to the instant motions only to whether McLellan has a "colorable claim to vested benefits" and, otherwise is not dispositive as to the withdrawn Third Cause of Action.

provisions of Section 414(n) of the [Internal Revenue] Code."  1996 Amended Plan §

IX.A(1)(g).  It is significant, however, that the Plan's definition of "employee" does not

exclude common law employees, temporary employees or "leased employees" to whom

IRC § 414(n) does not yet apply.

The Plan defines the term "service" as "the length, in years and fractions of a

year, of an employee's period of 'continuous service' for computing the amount of a

pension as determined under the provisions of [DuPont's] Continuity of Service Rules . .

. ."  1996 Amended Plan § IX.A(3)(a).   The record does not contain a copy of the

referenced "Continuity of Service Rules."[23]   Nevertheless, the Plan explains that

> An employee whose service is not credited under the Continuity of Service
> Rules, pursuant to Section II.1(c) of such Rules, will be credited with service only
> for purposes of determining eligibility for benefits under Section V [entitled
> "Vested Right to Deferred Pension"] of this Plan as follows:
> (i)     Such an employee compensated with respect to 1,000 or more
>         hours during a computation period will be credited with one year of
>         service.  Once having established such a year of service, an
>         employee will be credited with an additional year of service for each
>         computation period during which he is compensated with respect to
>         1,000 or more hours.
> (ii)    Such an employee will not receive service credit if he is
>         compensated for less than 1,000 hours during a computation
>         period.
> (iii)   Such an employee will incur a break in service if he is compensated
>         with respect to 500 or less hours in a computation period.  *Prior
>         service shall be taken into account only after establishing an
>         additional year of service.*

1996 Amended Plan § XI.A(3)(a)(i)-(iii) (italics added).

The Plan defines a "computation period" as referenced in § XI.A(3)(a) as "a period of 12

---

[23] In fact, McLellan had yet to receive a copy of such rules when he moved, on December 14,
2005, for partial summary judgment.  Plaintiff's Memorandum at 9 (advising that no Plan documents were
received from Defendants until January 6, 2005 when Defendants' first responses to McLellan's discovery
requests were furnished).

consecutive months commencing the later of January 1, 1976, or the employee's first day of employment or reemployment, whichever is applicable, or any succeeding anniversary or such date."  1996 Amended Plan § XI.A(3)(c).  The Plan also provides that "[e]ach employee shall become a participant in the Plan on his first day or employment or reemployment, except that an employee whose service is not credited under the Continuity of Service Rules shall not be eligible to participate in the Plan prior to January 1, 1976."  1996 Amended Plan § XI.A(3)(f).

A plain reading of these provisions establishes that the Plan does not recognize a "computation period" prior to January 1, 1976, nor permit the participation of an employee whose service is not credited under the Continuity of Service Rules prior to January 1, 1976, for purposes of <u>calculating</u> an employee's benefits; the Plan, however, fails to specify that any service by employees prior to January 1, 1976 is forfeited for the purposes of <u>vesting</u> in the Plan.  Rather, the Plan provides that when an employee incurs a break in service, *i.e.*, is compensated for less than 500 hours during a computation period, "[p]rior service shall be taken into account only after establishing an additional year of service."  1996 Amended Plan § XI.A(3)(a)(iii).

As relevant to the instant case, McLellan, as a full-time direct DuPont employee during his first employment period, between 1963 and 1972, accrued 8 years and 10 months toward vesting in the Plan.  Nothing in the record establishes that McLellan, upon his initial termination in 1972, forfeited such years of service for purposes of vesting or calculation of benefits under the Plan.  Further, despite McLellan's break in service between his 1972 termination and his rehire as a common law employee in 1997, McLellan, upon being compensated for 1,000 hours after his 1997 rehire for the

second employment period, had his prior service restored.  1996 Amended Plan §

IX.A(3)(a)(iii).   Assuming, *arguendo*, McLellan, as a full-time employee, First McLellan

Affidavit ¶ 7, worked a standard 40 hour week,[24] McLellan would have been

compensated for 1,000 hours approximately 25 weeks (40 X 25 = 1,000) after his rehire,

and, with his 8 years 10 months previous service earned during his first employment

period, which is in excess of the five years required to vest, would have vested six

months before McLellan qualified as a "leased employee" for purposes of IRC § 414(n)

so as to be excluded from the Plan's definition of "employee."

Further, ERISA's minimum participation requirements of a covered plan, like the

Plan in this case, are set forth under 29 U.S.C. § 1052(a), and provide that "[n]o pension

plan may require, as a condition of participation in the plan, that an employee complete

a period of service with the employer or employers maintaining the plan extending

beyond the later of the following dates - (i) the date on which the employee attains the

age of 21; or (ii) *the date on which he completes 1 year of service*."  29 U.S.C. §

1052(a) (italics added).  The Supreme Court has noted that ERISA establishes such

"minimum rules for employee participation" so as to "ensure that employee pension

expectations are not defeated."  *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510

n. 5 (1981).  *See Renda*, *supra*, 806 F.Supp. at 1081 ("Section 1052(a) effectively

prohibits participation requirements which discriminate against certain employees such

as leased employees.").  When § 1052(a)'s minimum participation requirement of one

year of service is considered in tandem with IRC § 414(n)'s requirement that leased

---

[24] According to a copy of a time card attached to the First McLellan Affidavit, for the week ending
March 9, 2003, McLellan worked a total of 68 hours.

individuals who preform services for a recipient on a full-time basis for at least one year "of a type historically performed by employees for the recipient of those services in that business field, are to be considered employees of the recipient of those services," *Renda*, *supra*, at 1078, it logically follows that § 1052(a)'s stated one year minimum participation requirement ensures that no leased employee, who renders services to a recipient beyond one year, is excluded from an ERISA-covered benefit plan.

Put another way, the 1996 Plan Amendment's exclusionary provision excludes from Plan eligibility any employee who must, for the limited purposes of IRC § 414(n)'s "leased employee" provision, be treated as a DuPont employee, regardless of whether such employee could be considered a common law employee.  However, McLellan was not required to be treated as such an excluded employee until he had rendered services to DuPont for at least one year. 26 U.S.C. § 414(n)(2).  With McLellan's undisputed completion of one year of such service, *i.e.*, in 1964, however, McLellan had fulfilled § 1052(a)'s minimum participation requirement thus gaining for McLellan protection against any deprivation of Plan benefits based on length of service that was triggered on the day he was rehired as a common law employee by DuPont through Adecco. Further, based on McLellan's first employment period with DuPont from 1963 until 1972, McLellan had previously accrued the minimum five years service required to vest in the Plan as amended.  Thus, McLellan's entitlements under the Plan as amended do not turn on McLellan's second employment period, whether or not McLellan was classified as a leased employee, and any attempt by Defendants to apply the leased employee exclusion to him violated § 1052(a).

Moreover, according to DuPont's Summary Plan Description ("SPD") dated July

2003,[25] the Plan provided that upon rehire by DuPont, a former DuPont employee's service from his prior period of employment would be restored for vesting purposes, and the amount of any pension would be calculated based on the second period of employment plus the service restored from the first period of employment.  2003 Amended Plan (Plaintiff's Exh. H), at 23 § 2.  The SPD does not contain the leased employee exclusion, nor does the SPD explain that previous service prior to January 1, 1976 may not be recognized in establishing Plan participation eligibility. This conflict between the terms of the SPD and the Plan requires that the SPD terms control. *Frommert*, *supra*, 433 F.3d at 265.

Significantly, in the absence of both the leased employee exclusion and the clause excluding from consideration service prior to January 1, 1976, McLellan would have vested immediately upon being rehired for the second employment period as required for the second prong under the *Bauer* test.  *Bauer*, *supra*, 325 F.3d at 160.  As such, McLellan has more than "a colorable claim to vested benefits" sufficient to confer standing in this action.  *Firestone*, *supra*, 489 U.S. at 117.

Defendants' motion for summary judgment on the First and Second Causes of Action based on McLellan's lack of standing therefore should be DENIED.


**C.     First Cause of Action - Interference with Vesting**

As stated, McLellan asserts as his First Cause of Action that DuPont employed McLellan through Adecco, a temporary employment agency, in order to prevent

---

[25] No copy of the SPD in effect upon the commencement of McLellan's second employment period is in the record.

McLellan from attaining entitlement to ERISA covered benefits, including pension plan

benefits, under the Plan, as well as other benefits DuPont offered its employees, in

violation of 29 U.S.C. § 1140, ERISA § 510.  Complaint ¶¶ 23-26.  At the threshold,

Defendants argue in support of summary judgment that this claim is time-barred under

the relevant two-year limitations period[26] as McLellan should have known when he was

initially hired through Adecco that DuPont had "misclassified him as a leased employee

to avoid providing him with pension benefits."  Defendants' Memorandum at 3-5.

Alternatively, Defendants assert that McLellan's First Cause of Action fails to state a

claim insofar as 29 U.S.C. § 1140 does not prohibit such a "misclassification" of an

employee as a leased employee, thereby rendering the employee ineligible for pension

benefits.  Defendants' Memorandum at 6-8.

In opposition to summary judgment, McLellan argues Defendants have

misconstrued the First Cause of Action as asserting DuPont "misclassified" McLellan as

a leased employee, rather than asserting, as McLellan alleged, that DuPont failed to

rehire McLellan as a direct DuPont employee to prevent McLellan, whose substantial

service from his first employment period with DuPont would be credited toward

DuPont's ERISA-covered Plan upon being rehired, from vesting in DuPont's pension

plan on the basis that if McLellen had been hired as a direct DuPont employee, rather

than working for DuPont through a third party, Adecco, McLellan, given his previous

_____

[26] McLellan does not argue that under the federal equitable tolling doctrine, McLellan's ERISA claims did not accrue until McLellan had or, with the exercise of reasonable diligence, should have had actual knowledge of the existence of a claim, the discovery of which Defendants fraudulently concealed. *See Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983) (observing that although state law determines the applicable limitations period, federal law determines when the claim accrues and, "[u]nder federal law, when the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.").

nine years employment with DuPont, would have vested immediately upon his rehire as

a direct DuPont employee.  Complaint ¶ 24;  Plaintiff's Response at 7-10.  McLellan

further contends that no caselaw supports Defendants' assertion that DuPont's failure to

rehire McLellan fails to state a cause of action under 28 U.S.C. § 1140.  Plaintiff's

Response at 11-13.  Defendants, in further support of summary judgment, argue that

McLellan lacks standing under 28 U.S.C. § 1140, as he is neither a participant or

beneficiary of the Plan, Defendants' Reply at 1-3, reiterate their argument that

McLellan's First Cause of Action fails to state a claim, Defendants' Reply at 3-4, and

maintain that the continuing violation exception to the applicable statute of limitations

does not apply, *id.* at 4-6.

> As relevant, ERISA § 510 ("§ 510") provides that

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or *discriminate* against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . .

29 U.S.C. § 1140 (italics added).

According to the Second Circuit,

> Section 510 [of ERISA] protects against (1) the disruption of employment privileges to prevent the vesting or enjoyment of benefit rights; (2) the disruption of employment privileges to punish the exercise of benefits rights; and (3) the disruption of employment privileges to prevent or punish the giving of testimony in any proceeding relating to ERISA or a sister act."

*Sandberg v. KPMG Peat Marwick, LLP*, 111 F.3d 331, 334 (2d Cir. 1997) (citing *Teumer v. General Motors Corp.*, 34 F.3d 542, 544-46 (7th Cir. 1994)) (bracketed text added).

ERISA § 510 "' was designed to prevent unscrupulous employers from discharging or

harassing employees in order to keep them from obtaining vested pension rights.'"

*Sandberg*, *supra* (quoting *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988)) (additional internal quotation omitted).  Further, a § 510 violation requires that the challenged conduct of the defendant employer was specifically intended to violate ERISA.  *Lindeman v. Mobile Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998) (citing cases).

In the instant case, § 510 may, by its plain language, provide McLellan a legal avenue for redress against DuPont for any adverse action taken by Defendants in response to McLellan's exercising a right to which McLellan is entitled under the Plan, or for interfering with McLellan's attainment of a right to which McLellan may become eligible under the Plan.  Nevertheless, relief under § 510 for adverse action taken for exercising a right under the Plan is unavailable to McLellan who, according to a careful review of the Complaint, fails to identify any such right exercised.  Rather, the instant lawsuit is intended to gain McLellan status as a participant by negating Defendants' refusal to acknowledge him as a participant so as to deny McLellan, at the time he was rehired through Adecco, attaining any such right.

As such, McLellan's First Cause of Action is properly construed as alleging a claim under only § 510's second prong, *i.e.*, against DuPont for interfering with McLellan's attaining of rights, by refusing to grant him participant status, to which he would otherwise be entitled under the Plan.  Establishing this claim thus turns on whether McLellan qualifies as a "participant" or a "beneficiary" as defined under ERISA so as to have standing to pursue a § 510 claim, as well as whether the term "discriminate," as used in § 510, is properly construed to include DuPont's hiring McLellan as a leased employee, rather than as its direct employee, so as to prevent

McLellan from vesting in the Plan.

At least one court has recognized a company's refusal to rehire an employee as stating a claim for relief under ERISA § 510 where the evidence establishes that such refusal to rehire is specifically intended to prevent a former employee from vesting in the company's ERISA-covered pension plan.  In *Nauman v. Abbott Laboratories*, 2005 WL 1139480 (N.D.Ill. Apr. 27, 2005), the plaintiffs alleged that the defendant former employer sold the division for which the plaintiffs worked with the specific intent of interfering with the plaintiff's attaining vested rights to pension benefits under the applicable ERISA-covered plan.  *Nauman*, *supra*, at * 1.  In particular, the plaintiffs, all sales representatives for the defendant company, alleged that the defendant routinely moved its "aging" workforce into a specific division which soon became the defendant's "most senior division" with 70% of its employees age 40 or older.  *Id*.  The defendant company, in attempting to "avert the looming enormous [retirement] benefit costs that it would incur" should the subject division's employees succeed in retiring from the company and become eligible for vested retirement benefits, decided to "spin off" the division into a new, affiliated company, thereby terminating the employees of the aging division en masse from the parent company, and ensuring that the employees of the new company would not receive the ERISA-covered pension benefits to which they would otherwise have been entitled by adopting no-hire policies precluding the reassigned employees from returning to the defendant company for two years.  *Id*. According to the defendant company's ERISA-covered plan, the two-year period constituted a break in service which had the effect of reducing an employee's benefits that could be earned upon being rehired by the defendant company.  *Id*.  The court held

that under the circumstances, the plaintiffs had established more than just a loss of

benefits; rather, the plaintiffs had demonstrated the defendant company, by reassigning

the plaintiffs from a division of the parent company to the new affiliated company,

effectively terminated the plaintiffs with the specific intent of preventing them from

attaining retirement rights to which they would otherwise have been entitled.  *Id*. at * 3

(citing *Lindemann*, *supra*, 141 F.3d at 295) (to state a claim under § 510, "plaintiffs must

establish more than a loss of benefits; they must demonstrate that their employers

terminated them with the specific intent of preventing or retaliating for the use of

benefits.").  The plaintiffs' allegations that the no-rehire policies were not separately

adopted but, rather, were created and adopted as an integral part of a scheme to

terminate the plaintiffs from their employment with the defendant company to prevent

the accrual of retirement benefits under the Plan, stated a claim under § 510.  *Id*. at *6.

In the instant case, however, as discussed, Discussion, *supra*, at 29-32, it has

been established that despite DePont's assertion that McLellan was a leased employee

from January 1997 through June 2003, *i.e.*, the second employment period, the record

demonstrates that McLellan was a common law DuPont employee during such period.

As such, the First Cause of Action fails on summary judgment, for lack of evidence

insofar as McLellan asserts DuPont refused to rehire him.

Even assuming Defendants have properly construed McLellan's First Cause of

Action as alleging that DuPont did not refuse to rehire McLellan but, rather,

administratively "misclassified" McLellan as, according to its internal corporate

nomenclature, a "leased" rather than a "direct" DuPont employee so as to prevent

McLellan from vesting in the Plan, there is no merit to such claim for two reasons.

First, although not addressed by the Second Circuit, district courts within this circuit, consistent with the provision that ERISA may legitimately exclude certain classes of employees from eligibility, so long as the basis for such exclusion is neither age nor length of service as discussed, have held that no cause of action lies under § 510 for an alleged misclassification of one's employee status. *Downes v. J.P. Morgan Chase & Co.*, No. 03 Civ. 8991, 2004 WL 1277991, * 5 (S.D.N.Y. June 8, 2004); *Williams v. American International Group, Inc.*, No. 01 Civ. 9673, 2002 WL 31115184 * 2 (S.D.N.Y. Sept. 23, 2002); and *Schwartz v. Independence Blue Cross*, 299 F.Supp.2d 441, 450 (E.D.N.Y. 2003).  Absent any caselaw recognizing a § 510 claim based on an alleged misclassification, the First Cause of Action fails to state a claim on such theory.

Second, assuming, *arguendo*, that § 510 can be construed as permitting a misclassification claim, even if DuPont had "misclassified" McLellan as a leased employee, McLellan cannot allege to have suffered any injury based on the misclassification.  Specifically, any misclassification by DuPont of McLellan as a "leased employee" does not negate the finding that the record establishes McLellan was, in fact, a common law employee.  Discussion, *supra*, at 29-32.  Despite McLellan's status as a common law DuPont employee, under ERISA, "it does not follow that he is automatically entitled to benefits. [Rather, 'a]n ERISA plan may . . . legitimately exclude certain classes of ERISA 'employees' as long as that exclusion is not based on age *or length of employment*.'"  *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 321 (S.D.N.Y. 2001) (quoting *Administrative Comm. of the Time Warner, Inc. v. Biscardi*, No. 99 Civ. 12270, 2000 WL 1721168, * 9 (S.D.N.Y. Nov. 17, 2000) (citing *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1340 & n. 2 (11th Cir. 2000))) (italics added).  Such a "safe

harbor rule" is relevant to the instant case, however, only insofar as Defendants have construed McLellan's First Cause of Action as one for "misclassification," Defendants' Memorandum at 6-8, because the Plan's attempt to exclude leased employees from its ERISA-covered pension benefits fails to exclude McLellan, who entered the second employment period with more than the requisite five years of service from his first employment period so as to vest in the Plan upon being compensated for 1,000 hours after rehire.  Discussion, *supra*, at 36-38.

More particularly, the Plan in effect when McLellan commenced his second employment period with DuPont as a CFC in January 1997, provided that an "employee" would "acquire a nonforfeitable right" to DuPont's ERISA-covered deferred pension plan benefits provided the employee had at least five years of service or had reached the specified retirement age of either 60 or 65.  1996 Amended Plan, § V(A)(1). In defining the term "employee," the Plan specifically "excludes individuals who must be treated as employees of the Company [DuPont] for limited purposes under the 'leased employees' provisions of Section 414(n) of the [Internal Revenue] Code."  1996 Plan Amendment § IX.A.(1)(g) ("Plan exclusion clause").  Although for the second employment period of his DuPont work through Adecco, McLellan could be treated as a DuPont employee "for limited purposes under the 'leased employees' provisions of [IRC § 414(n)]" and, as such, would seem to be a member of an excluded class of employees, because of McLellan's first employment period of 8 year and 10 months service from 1963 to 1972 as a direct DuPont employee, McLellan vested in the Plan after being compensated for 1,000 hours work after his rehire as a common law employee.  *See* Discussion, *supra*, at 36-38.  Further, insofar as the Plan's leased

employee exclusion was intended to prevent McLellan from vesting in the Plan, the exclusion would prevent McLellan from vesting under the Plan based on the length of his first employment period, a prohibited basis of such exclusions. *Gustafson*, *supra*, 171 F.Supp.2d at 321. Moreover, the failure to include the leased employee exclusion in the Plan's SPD creates an ambiguity requiring application of the SPD terms which restore for vesting purposes a former DuPont employee's service from a prior period of employment upon rehire. Discussion, *supra*, at 40. As such, Defendants' reliance on the 1996 Plan Amendment's exclusionary provision in support of their misclassification argument is misplaced.

Therefore, Defendants' asserted misclassification of McLellan as a leased employee is ineffective to prevent McLellan, as a Plan participant, from attaining entitlement to benefits under the Plan. Defendants' classification of McLellan as a leased employee, even if erroneous, does not interfere with such entitlement, and any asserted discrimination based on misclassification is a legal futility, which is insufficient to avoid summary judgment. *See Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 21 (2d Cir. 1976) (observing summary judgment should not be denied where the only issues are frivolous or immaterial and any trial on such issues would be futile or purposeless) (citing *U.S. v. Matheson*, 532 U.S. 809, 812-13 (2d Cir. 1976)).

Accordingly, although McLellan may have stated a viable claim under the First Cause of Action based on a failure to rehire, he has not similarly stated such a claim based on misclassification and the claim should therefore be DISMISSED. Furthermore, for the reasons discussed, summary judgment on the First Cause of Action based on failure to rehire should nonetheless should be GRANTED in favor of

48

Defendants.

### D.      Limitations Period

Alternatively, should the District Judge disagree with the recommendation that the papers establish McLellan was a common law DuPont employee, and find that McLellan has stated a claim that DuPont misclassified him as a leased employee in order to render McLellan ineligible for DuPont's ERISA-covered pension plan, the court addresses Defendants' contention that the First Cause of Action is time-barred because McLellan did not commence legal action until more than two years after he was hired for the second employment period for the CFC position with DuPont as a leased employee through Adecco.  Defendants' Memorandum at 3-5.  McLellan argues in opposition that although he was initially hired for a single project, the strontium project, that was expected to take 12 to 18 months to complete, McLellan Deposition Testimony[27] at 15; Keppler Deposition Testimony[28] at 25, 66; Kasprzak Deposition Testimony[29] at 23, upon completing the strontium project, McLellan remained at DuPont where he worked on a series of projects, the last of which was the Terathane Project which he commenced in July 2002, rendering the action timely.  Plaintiff's Response at 7-10.  As such, McLellan urges that the applicable limitations period should commence running with the date McLellan began working on the Terathane Project in July 2002.  *Id*.   Alternatively,

---

[27] Plaintiff's Exh. C.

[28] Affirmation of Barry Donohue, Esq. in Support of Plaintiff's Motion to Compel (Doc. No. 39) filed August 8, 2005 ("Donohue Motion to Compel Affirmation") Exhs. E1 and E2.

[29] Donohue Motion to Compel Affirmation Exh. D.

McLellan maintains that under a continuing violation theory, the § 510 failure to rehire claim was accrued anew with the delivery of each weekly paycheck. *Id*. at 10 (citing *Bazemore v. Friday*, 478 U.S. 385, 395 (1986) ("Each week's paycheck that delivers less to a black [employee] than to a similarly situated white [employee] is a wrong actionable under Title VII.") (bracketed text added).   Defendants argue in further support of summary judgment on their statute of limitations defense that the continuing violation theory does not apply because McLellan was never terminated from working at DuPont, a necessary prerequisite if McLellan were indeed "rehired" for the Terathane Project, and that a continuing violation theory does not apply to ERISA claims based on misclassification.  Defendants' Reply at 4-6.

A two-year limitations period applies to all ERISA § 510 claims.  *Sandberg*, *supra*, 111 F.3d at 336 (adopting two-year limitations period applicable to claims filed pursuant to N.Y. Work. Comp. Law § 120 as applicable to ERISA § 510 claims).  Such a claim accrues with the occurrence of the alleged discriminatory act.[30]  *Id*. at 335-36.

In the instant case, the alleged discriminatory act, *i.e.*, DuPont's classification of McLellan as a leased employee, the predicate act for the First Cause of Action, occurred when McLellan was initially hired and began receiving his paycheck from Adecco, rather than from DuPont.  *See Schultz v. Texaco, Inc.*, 127 F.Supp.2d 443, 448 (S.D.N.Y. 2001) (holding plaintiffs' § 510 claim accrued with the alleged removal from the putative employer's payroll at which time plaintiffs were treated by the defendant as

_____

[30] In contrast, an action under ERISA for breach of a fiduciary duty with respect to an ERISA-covered plan is subject to a limitations period of the earlier of six years from the date of the last action constituting part of the alleged breach, or three years from the earliest date on which the plaintiff had actual knowledge of the alleged breach of violation.  ERISA § 413(2), 29 U.S.C. § 1113(2).  *Frommert*, *supra*, 433 F.3d at 272.

independent contractors and placed on the payroll of various temporary employment agencies).  The only document covering McLellan's leased employment with DuPont is the Employment Agreement executed by McLellan and Adecco on January 8, 1997. The Employment Agreement, however, does not contain any provision for the termination of McLellan's employment, nor does it provide that the Employment Agreement would remain in effect only until McLellan completed the project for which he was originally hired to perform as a CFC for DuPont, *i.e.*, the Strontium project.  As such, there is no basis on which to find that the Employment Agreement was renewed when McLellan was assigned to the Terathane Project in July 2002, less than two years prior to commencing the instant action.  Rather, the Complaint alleges one continuous period of employment commencing January 8, 1997 and continuing through June 2003. McLellan points to no other date from which to measure the accrual of his § 510 claim. Thus, McLellan's § 510 clause of action accrued upon receipt of his first pay check from Adecco in 1997, more than two years prior to the filing of the Complaint.

Accordingly, in the alternative, McLellan's First Cause of Action is time-barred.

### E.  Second Cause of Action - Civil Penalty for Failure to Furnish Plan Documents

McLellan alleges as his Second Cause of Action that the Plan Administrator failed to provide him with the requested Plan documents and that, as a result of such failure, is liable to McLellan under 29 U.S.C. § 1132(c)(1)(B) for a civil penalty in the amount of $ 100 per day commencing December 5, 2003, until the documents are provided which, as of the date this action was commenced, totaled $ 10,800.  Complaint

¶¶ 27-29.[31]  In support of summary judgment on this ground, McLellan maintains that he

has at least a colorable claim for pension benefits under the Plan and, as such, is

entitled to be awarded a penalty pursuant to § 1132, and need not establish prejudice,

although McLellan has experienced prejudice.  Plaintiff's Memorandum at 8-9.

Defendants argue in opposition that McLellan does not have standing to pursue

this claim because McLellan is neither a Plan beneficiary nor a participant as defined

under ERISA.  Defendants' Response at 1-2.  According to Defendants, although

McLellan maintains he is a Plan participant because he has a "colorable claim for

vested benefits," the only such claim McLellan had was the Third Cause of Action under

29 U.S.C. § 1132(a)(1)(B) which McLellan voluntarily withdrew by stipulation.

Defendants' Response at 2-4.  Alternatively, Defendants assert that the facts do not

support a penalty award under § 1132(c)(1) based on the relevant factors, including (1)

bad faith; (2) length of the delay; (3) number of requests made and the documents

withheld; and (4) resulting prejudice to the participant or beneficiary.  *Id*. at 5-7.  As a

further alternative, Defendants request an evidentiary hearing to determine the amount

of any penalty to be imposed.  *Id*. at 7.

Preliminarily, as discussed, McLellan qualifies as a participant under the Plan

given that McLellan has "a colorable claim to vested benefits."  Discussion, *supra*, at 40-

41.  Further, it is undisputed that McLellan, through his attorney, initially requested plan

documentation from the Plan Administrator on December 5, 2003, but that McLellan did

---

[31] Defendants assert no statute of limitations defense to this claim.  To date, although obtained by McLellan through discovery, the documents have never been formally tendered by the Plan Administrator responsive to McLellan's demand.

not receive any such documentation until January 6, 2005, in connection with the

discovery phase of the instant litigation.

ERISA disclosure provisions provide, in relevant part

The [Plan] administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.  The administrator may make a reasonable charge to cover the cost of furnishing such complete copies.  The Secretary [of Labor] may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4) ("§ 1024(b)(4)").

Additionally, pursuant to ERISA § 502(c),

[a]ny [ERISA-covered plan] administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $ 100 per day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B) ("§ 1132(c)(1)(B)") (bracketed text added).

Thus, as McLellan was, at the time of his request for Plan documents, a participant

based on his status as a former direct DuPont employee with a colorable claim to

vested benefits, the Plan's refusal to provide the requested documents was plainly in

violation of § 1024(b)(4) and, as the refusal extended for more than 30 days, it became

actionable under § 1132(c)(1)(B).

Nor is there any merit to Defendants' assertion that McLellan, by asking the court

only to find that he has a "colorable claim" for benefits, is without standing to pursue his

§ 1132(c)(1)(B) claim because McLellan has not filed a claim for benefits and, thus, there has been no determination by the Plan Administrator regarding McLellan's entitlement to benefits so as to confer jurisdiction under ERISA on this court to decide whether McLellan "has a colorable claim for benefits nor [to] adjudicate [McLellan's] entitlement to Plan benefits."  Defendants' Response at 3-4 (citing *Peterson v. Continental Cas. Co.*, 282 F.3d 112, 117 (2d Cir. 2002).  A careful reading of *Peterson*, *supra*, reveals that it addresses federal courts' jurisdiction only with regard to adjudicating "whether an employee is eligible for benefits under an ERISA plan." *Peterson*, *supra*, at 117.  As McLellan's § 1132(c)(1)(B) claim, the Second Cause of Action, does not require a finding as to whether McLellan is, in fact, eligible for benefits under an ERISA plan but, rather, only whether McLellan has a colorable claim to such benefits, invoking § 1132(c)(1)(B)'s protections so as to warrant DuPont's compliance with McLellan's request for the relevant Plan documents, Defendants' standing argument is without merit.  Thus, Defendants' assertions that McLellan's Second Cause of Action lacks a jurisdictional foundation is equally meritless.

The Supreme Court has observed that Congress's intent was not to require that an individual know "exactly where he stands with respect to the plan" before having a colorable claim for benefits so as to be considered a "participant" as defined under § 1132(a)(1), and stated that "[f]aced with the possibility of $100 a day in penalties under § 1132(c)(1)(B), a rational plan administrator or fiduciary would likely opt to provide a claimant with the information requested if there is any doubt as to whether the claimant is a 'participant,' especially when the reasonable costs of producing the information can be recovered [from the claimant.]"  *Firestone*, *supra*, 489 U.S. at 118 (citing 29 CFR §

2520.104b-30(b) (1987) (the "charge assessed by the plan administrator to cover the costs of furnishing documents is reasonable if it is equal to the actual cost per page to the plan for the least expensive means of acceptable reproduction, but in no event may such charge exceed 25 cents per page.")).

The Second Circuit has instructed that in assessing whether to award a penalty under § 1132(c)(1)(B), "courts have considered various factors, including 'bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary.'" *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 90 (2d Cir. 2001) (quoting *Pagovich v. Moskowitz*, 865 F.Supp. 130, 137 (S.D.N.Y. 1994)).  No one of these factors is required and even the absence of prejudice will not necessarily defeat the award of a penalty.  *Pagovich*, *supra*, at 137 ("[L]ack of prejudice is not a barrier to the imposition of penalties.").  *See also Kascewicz v. Citibank, N.A.*, 837 F.Supp. 1312, 1322 (S.D.N.Y. 1993) (considering "equally significant" as prejudice in determining whether to award penalties under ERISA § 502 for failure to provide documents "is the conduct of the plan administrator in responding to the participant's request for plan documents requested by ERISA.").

In *Pagovich*, *supra*, the court awarded the plaintiff a civil penalty under § 502 after determining that the defendant employer's failure to provide the plaintiff with plan documents responsive to the plaintiff's request was "deliberate or wilful" and indicated that the defendant employer "showed at a minimum a careless indifference for the statutory rights of plaintiff to receive information and for his own statutory obligations to provide it," given that the plaintiff had made several verbal requests for the documents,

followed by two written requests, and finally resorted to commencing litigation before the requested documents were received in response to discovery requests made in connection with the litigation.  *Pagovich*, *supra*, 865 F.Supp. at 138. The court also acknowledged that the plaintiff's inability to discovery any information about the plan caused the plaintiff distress and frustration and compelled the plaintiff to retain counsel and commence legal action "to receive information to which she was unquestionably entitled."  *Id*.  In *Kascewicz*, *supra*, the court awarded a civil penalty where the defendant employer, "one of the largest and most sophisticated banking institutions in the world," displayed "complete indifference" to the plaintiff's request for a copy of the SPD, which the defendant had never even created, such that the plaintiff was forced to retain counsel and initiate legal action to determine his rights under the plan. *Kascewicz*, *supra*, 837 F.Supp. at 1323.  In awarding the civil penalty, the court stated that "[s]omeone who is compelled to retain counsel and incur expense to determine where he stands in relation to an ambiguous plan, has suffered an injury regardless of the ultimate conclusion of eligibility."  *Id*.

Similarly, in the instant case, McLellan asserts, and Defendants do not deny, that DuPont refused to provide any of the Plan documents in response to McLellan's written requests and, in fact, McLellan only received such documents in connection with the discovery phase of this action, more than one year after the initial request was made on December 5, 2003, and well after the 30-day statutory time limit.  Nor does the Defendant Plan Administrator deny that Donohue's December 22, 2003 Letter provided sufficient information upon which to conclude that McLellan could be a Plan participant. Plaintiff's Reply at 3-5.  These circumstances sufficiently justify awarding McLellan a

penalty pursuant to 29 U.S.C. § 1132(c)(1)(B).  *See Pagovich*, *supra*, 865 F.Supp. at 137; *Kascewicz*, *supra*, 837 F.Supp. at 1322-23.

As such, summary judgment on McLellan's Second Cause of Action should be GRANTED in favor of McLellan and DENIED as to Defendants.  Furthermore, because no evidence has been presented as to the amount of the civil penalty to be imposed, and because § 1132(c)(1)(B) provides for the court with the discretion to award such penalty "in the amount of up to $ 100 a day," the parties should be directed to file their respective positions as to the appropriate amount of such award in writing within 10 days of service of this Report and Recommendation.

**3.    Fourth and Fifth Causes of Action - Age-Based Employment Discrimination**

McLellan alleges as his Fourth and Fifth Causes of Action that DuPont's termination of his second period of employment on June 28, 2003 was motivated by McLellan's age, asserting that DuPont replaced McLellan with two employees younger than McLellan, in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and New York's Human Rights Law ("HRL"), New York Executive Law ("N.Y. Exec. Law") § 296 *et seq.*[32, 33]  Defendants argue in support of dismissal of this claim that no reasonable jury could conclude that DuPont was

---

[32] Unless otherwise noted, references to N.Y. Exec. Law are to "McKinney 2005."

[33] McLellan, as a common law employee of DuPont, has standing to assert his employment discrimination claims.  *See Tri-State Employment Services, Inc. v. Mountbatten Surety Co., Inc.*, 295 F.3d 256, 269 n. 12 (2d Cir. 2006) (noting "a worker may be viewed in one context (for example, for employment tax and employee benefit purposes) as a common-law employee of one entity and in another context (for instance, for employment discrimination purposes) as the employee of another.").

motivated by McLellan's age to terminated McLellan's services.  Defendants'
Memorandum at 12-14.  In particular, Defendants maintain that McLellan cannot
establish a *prima facie* case of age-based employment discrimination, Defendants'
Memorandum at 14-18, that DuPont has articulated a legitimate non-discriminatory
reason for terminating McLellan's services, *id.* at 18, and that McLellan cannot
demonstrate DuPont's reason for termination was mere pretext for a discriminatory
action, *id.* at 18-21.  McLellan argues in opposition to summary judgment the mere fact
that Defendant chose to retain two younger, direct DuPont employees to perform the
CFC duties in the Sodium area previously rendered by McLellan as a leased employee
presents an issue of fact, to be resolved by a jury, sufficient to rebut Defendant's
articulated nondiscriminatory reason for terminating McLellan's services.  Plaintiff's
Response at 13-14.[34]

It is settled that a district court has jurisdiction over claims for employment
discrimination pursuant to the ADEA only after a plaintiff has exhausted administrative
remedies by filing a charge with the EEOC and obtaining a Notice of Right to Sue from
that agency.  *See* 29 U.S.C. § 626(d) (1988)(ADEA administrative exhaustion
requirement); *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994) (prior to
commencing employment discrimination action under the ADEA, the plaintiff must file
an administrative claim with the EEOC within a specified period after the alleged
violation and receive a right-to-sue letter); *Miller v. International Telephone and
Telegraph Corp.*, 755 F.2d 20, 26 (2d Cir.) (exhaustion of administrative remedies

---

[34] Defendants' Reply does not further address this issue.

required for ADA claims), *cert. denied*, 474 851 (1985).  Significantly, "[t]he purpose of the notice provision, which is to settle discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC."  *Miller*, *supra*, at 26.

In the instant case, McLellan fails to allege that he exhausted administrative remedies by filing a charge with the EEOC and obtaining a right to sue letter, nor has McLellan attached a copy of any right to sue letter to the Complaint as proof of administrative exhaustion.  As such, McLellan's Fourth Cause of Action alleging age-based employment discrimination in violation of the ADEA should be DISMISSED for lack of jurisdiction, and Defendants' motion for summary judgment should be GRANTED as to the Fourth Cause of Action.

Plaintiff's Fifth Cause of Action alleging age-based employment discrimination in violation of New York Human Rights Law, N.Y. Exec. Law, however, does not similarly require exhaustion of administrative remedies.  *See Branker v. Pfizer, Inc.*, 981 F.Supp. 862, 865 (S.D.N.Y. 1997) (observing plaintiff's age employment discrimination claims under N.Y. Human Rights Law was not administratively barred "because that statute contains no requirement of exhaustion of administrative remedies.").  As such, the court has jurisdiction over Plaintiff's age-based employment discrimination claim under New York Exec. Law § 296 as pleaded in the Fifth Cause of Action.

New York's Human Rights Law ("HRL") "makes it unlawful for an employer 'to discriminate against [an] individual in promotion, compensation or in terms, conditions,

or privileges of employment, because of such individual's age.'"[35]  *Abdu-Brisson v. Delta*

*Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting N.Y. Exec. Law § 296.3-a).

Age discrimination actions brought under New York's HRL are subject to the same

analysis as claims brought under the ADEA, *Abdu-Brisson*, *supra*, at 466 (citing

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997)), and ADEA claims

are analyzed "under the same burden shifting framework as claim brought pursuant to

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*,"

*Abdu-Brisson*, *supra* (citing *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)),

which was first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973).

        In particular, the burden-shifting framework requires a plaintiff first establish a

*prima facie* case of age discrimination.  *McDonnell Douglas Corp.*, *supra*, 411 U.S. at

802-04.  Once a *prima facie* age discrimination case is established, the employer is

required to offer a legitimate, nondiscriminatory business rationale for the alleged

discriminatory action.  *Id*.  Upon articulating such a reason, the presumption of age

discrimination is dissolved, and the burden shifts back to the plaintiff to demonstrate the

proffered nondiscriminatory reason is merely pretextual, and that the adverse

employment action was actually motivated by age discrimination.  *Id*.; *Greenway v.*

*Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  "This trifurcated inquiry not only

specifies and assigns evidentiary burdens, but also injects a fine-tuning element into the

---

[35] With regard to the first element, workers over the age of 40 are protected under the ADEA, 29 U.S.C. § 631(a), but New York's HRL protects all employees over the age of 18, N.Y. Exec. Law § 296.3-a(a).

presentation of proof" in employment discrimination cases, whereby "an initially vague

allegation of discrimination is increasingly sharpened and focused, until the ultimate

inquiry is one that is amenable to judicial resolution." *Meiri v. Dacon*, 759 F.2d 989, 995

(2d Cir. 1985). "Indeed, the efficacy of employment discrimination law depends upon

the interdependence of the *prima facie* case, the employer's rebuttal and proof of

pretext." *Meiri*, *supra*, at 997 n. 12.

With regard to summary judgment in employment discrimination cases, the

Second Circuit has cautioned that

> when deciding whether this drastic provisional remedy should be granted in a
> discrimination case, additional considerations should be taken into account.  A
> trial court must be cautious about granting summary judgment to an employer
> when, as here, its intent is at issue.  Because writings directly supporting a claim
> of intentional discrimination are rarely, if ever, found among an employer's
> corporate papers, affidavits and depositions must be carefully scrutinized for
> circumstantial proof which, if believed, would show discrimination.

*Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1224 (2d
Cir. 1994) (citing cases).

Further, the theory underlying the *McDonnell Douglas* system for indirectly proving

discrimination

> is premised on the empirical observations that (1) employers generally act for a
> reason, and (2) those who can demonstrate no legitimate reason for acting more
> likely than not acted for a discriminatory reason.  Yet when the employer's
> nondiscriminatory reason is shown to be unworthy of belief, and could not
> therefore have been the real cause, the employer has in substance failed to
> articulate a valid explanation for discharging an employee and, moreover, has
> placed its credibility into question.

*Dister*, *supra*, 859 F.2d at 1113.

Applying this admonition, the court turns its attention to the first prong of the burden

shifting analysis, whether McLellan has alleged the elements necessary to support a

*prima facie* case of age-based employment discrimination.

### A.   *Prima facie* case

To establish a *prima facie* case of age-based employment discrimination, a plaintiff must establish (1) he is a member of a protected class; (2) he is qualified for the subject employment position; (3) has suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of employment discrimination. *Abdu-Brisson*, *supra*, 239 F.3d at 466-67 (citing *McDonnell Douglas*, *supra*, 411 U.S. at 802).  *See Ferrante v. American Lung Association*, 687 N.E.2d 1308, 1311 (N.Y. 1997) ("The standards for recovery under section 296 of the [New York] Executive Law are in accord with the Federal standards under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*).")").  Further, a plaintiff's burden for establishing a *prima facie* case of age-based employment discrimination is *de minimis*.  *Abdu-Brisson*, *supra* (citing *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995)).

In the instant case, McLellan alleges employment discrimination by DuPont insofar as McLellan's age was a motivating factor in DuPont's decisions not to hire McLellan as a direct employee, and to terminate McLellan on June 28, 2003, after the Terathan Project was completed, rather than transferring McLellan back to his previous CFC duties in the Sodium area, which were then performed by direct DuPont employee Potter, who was 20 years younger.  Complaint ¶¶ 40-45.  Defendants concede that McLellan can establish the first and third elements of a *prima facie* case of employment discrimination, Defendants' Memorandum at 14, but maintain that McLellan has failed to

establish the second and fourth elements of a *prima facie* case of age-based

employment discrimination, *i.e.*, that there were any positions available for which

McLellan was qualified when McLellan was terminated, or that McLellan's termination

occurred amidst circumstances giving rise to an inference of discrimination.

Defendants' Memorandum at 14-17.  In particular, Defendants maintain that nothing in

the record demonstrates that any other positions for which McLellan was qualified were

available when McLellan was terminated and that, insofar as McLellan maintains he

should have been returned to his previous CFC position in the Sodium area,

Defendants were not legally obligated to displace the direct DuPont employee who then

filled the position.  *Id*. at 15.  McLellan argues in opposition that the circumstances of his

termination, including that he was qualified for the Sodium area CFC position, yet

DuPont terminated McLellan and retained two other employees, each of whom were

both direct DuPont employees and at least 20 years younger, is evidence that his

termination was motivated by his age.  Plaintiff's Response at 13-14.

 With regard to the second element, a plaintiff challenging his termination in the

context of a reduction in force must demonstrate not that he was qualified for the

eliminated job but, rather, for other existing and available jobs.  *Windham v. Time

Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001) (citing *Maresco v. Evans Chemetics Div.

of W.R. Grace & Co.*, 964 F.2d 106, 111 (2d Cir. 1992) ("In the context of a

consolidation or reduction-in-force, where the employer is concededly engaged in a

process that will legitimately result in the elimination of some positions, an employee

must establish not that he was qualified for his previous position that has been

eliminated, but rather that he was qualified to assume another available position at the

time of discharge.") (internal quotation and brackets omitted)); *see also Gallo*, *supra*, 22 F.3d at 1224 (articulating the second element as requiring the plaintiff show he "was qualified to assume another position had it been available at the time [plaintiff] was discharged.") (bracketed text added).  According to the Second Circuit, this inquiry in employment discrimination cases involving a reduction in force "is highly fact specific," and two polar hypotheticals best illustrate the applicable analysis.  *Burger v. New York Institute of Technology*, 94 F.3d 830, 833 (2d Cir. 1996).

In the first hypothetical, if an older plant maintenance employee is laid off in connection with a company's decision to shut down the plant where the employee works, the employee could not prevail on an age-based employment discrimination claim based solely on the fact that a younger maintenance employee continued to be employed by the company in a similar plant because "no reasonable trier of fact could find that the shutting down of a plant was motivated by the age of the older maintenance person."  *Burger*, *supra*, 94 F.3d at 833.  In contrast, in the second hypothetical, presenting a situation in which a company with a phone bank lays off the oldest operator, the company could not prevail on a motion for judgment as a matter of law in on the theory that a desire to eliminate the particular phone used by that operator was the sole motive for the lay-off.  *Id*.

Here, although it is undisputed that McLellan was qualified to resume his CFC position in the Sodium area upon the completion of the Terathane Project, it is also undisputed that the Sodium area CFC position was not then available, its job duties having since been transferred to Douglas Potter ("Potter") and Jim Cody ("Cody"). Further, the New York Court of Appeals has held that an employer is "under no legal

obligation to create a new or additional job or to bump or displace" other employees to avoid an unlawful age-based employment discrimination claim. *Laverack & Haines, Inc. v. New York State Division of Human Rights*, 673 N.E.2d 586, 589 (N.Y. 1996) (holding employer did not unlawfully discriminate against discharged employee when, in the midst of a company downsizing, failed to displace a younger employee holding a lower classified position so as to avoid the employee's discharge). As such, DuPont likewise was under no obligation to displace other DuPont employees, whether direct or leased, so as to accommodate McLellan's desire to continue rendering services to DuPont after the Terathane Project's completion.

McLellan's argument, however, is that by arranging for McLellan's transfer from the CFC position in the Sodium area to the Terathane Project for the purpose of overseeing the project's dismantling and demolition, DuPont unlawfully arranged for McLellan's previous duties in the Sodium area CFC position to be assumed by Potter and Cody, both of whom were younger than McLellan, thereby ensuring no position for which McLellan was qualified was available upon the completion of the Terathane Project, resulting in McLellan's termination. In other words, McLellan maintains that absent his transfer to oversee the dismantling and demolition of the Terathane Project, McLellan would not have vacated the Sodium area CFC position and, thus, would have survived the reduction-in-force. Plaintiff's Response at 13. It is significant that DuPont does not deny that McLellan, upon the completion of the Terathane Project, was qualified to perform the CFC position in the Sodium area "had it been available" at that time. *Gallo*, *supra*, 22 F.3d at 1224. Accordingly, the second *prima facie* element is met.

65

With regard to the fourth element, Defendants maintain that the record is devoid of any evidence establishing McLellan was terminated under circumstances giving rise to an inference of age-based employment discrimination.  Circumstances held to give rise to the necessary inference of employment discrimination include (1) the employer seeking to replace the discharged plaintiff with another person possessing the same qualifications, but not a member of the protected class; (2) the employer's criticism of the plaintiff's work performance in terms degrading to the protected class; (3) the employer made invidious comments about others in the plaintiff's protected class; (4) the employer treated more favorably employees outside the protected class; (5) the sequence of events leading to the adverse employment discrimination; and (6) the timing of the adverse employment action.  *Chambers v. TRM Copy Centers Corporation*, 43 F.3d 29, 37 (2d Cir. 1994) (citing cases).  In the instant case, the first, fourth, fifth and sixth factors can be construed in McLellan's favor on this claim.

In particular, it is undisputed that McLellan was an employee over the age of 18 (first factor), that his employment was terminated following the completion of the Terathane Project, while Potter and Cody, both younger workers who had assumed McLellan's previous CFC position duties in the Sodium area after McLellan was transferred to the Terathane Project, were retained (fourth factor), that McLellan's transfer to the Terathan Project allowed DuPont to position other, younger employees in the Sodium area CFC position previously held by McLellan, which was not slated for termination (fifth factor), so that upon the completion of the Terathane Project, McLellan was left without a position with DuPont (sixth factor).  *See Burger*, *supra*, 94 F.3d at 834-35 (plaintiff provided sufficient circumstantial evidence to present *prima facie* case

of age discrimination in employment where evidence showed substantial portion of plaintiff's duties were not eliminated but, rather, transferred to younger employees, laid-off employee was oldest of three employees in department, younger employee was transferred into department when management was aware impending reduction-in-force would soon necessitate elimination of a position in the department, and it was the younger employee's transfer into the department that necessitated the lay-off).  *See also Gallo*, *supra*, at 1225 (reversing district court's grant of summary judgment in favor of defendant company and holding plaintiff established *prima facie* case of age-based employment discrimination where company transferred "most of [plaintiff's] duties" to another department and eliminated many of the plaintiff's remaining responsibilities, only to systematically resuscitate the duties months after the plaintiff's discharge). Taken as a whole, the circumstances under which McLellan ceased rendering services to DuPont creates a triable issue of fact as to whether DuPont's decision to terminate McLellan was motivated by McLellan's age.  As such, the fourth element for a *prima facie* case of age-based employment discrimination is met.

McLellan has thus met his *de minimis* burden of demonstrating all four elements necessary to establish a *prima facie* case of age-based employment discrimination, *Dister*, *supra*, 859 F.2d at 1114, and the burden thus shifts to DuPont to show a legitimate, nondiscriminatory business rationale for the alleged unlawful conduct.

### B.    Legitimate, nondiscriminatory reason for adverse employment action

With McLellan having demonstrated a *prima facie* case of age discrimination, DuPont "is obligated to produce evidence 'which, *taken as true*, would *permit* the

67

conclusion that there was a nondiscriminatory reason for the adverse action.'" *Gallo*, *supra*, 22 F.3d at 1226 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (italics in original)).  "This explanation must be 'clear and specific.'" *Gallo, supra* (quoting *Meiri*, *supra*, 759 F.2d at 997).  Affidavits establishing that a defendant employer was engaged in an economically necessary reduction-in-force when the challenged discharge occurred have been held sufficient to rebut a presumption of age discrimination established by a *prima facie* case.  *Gallo*, *supra*, at 1226 (holding that evidence was sufficient to rebut presumption of age-based employment discrimination where defendant employer "presented affidavits of its various officers to show that at the time it discharged [the plaintiff] the company was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals.").

In the instant case, DuPont submits in support of its motion for summary judgment the statement of Douglas M. Clarke, Jr. ("Clarke"), the Unit Manager of Operations at the Niagara Falls Plant.  Clarke Declaration ¶ 1.  According to Clarke, he has personal knowledge that in April 2002, DuPont undertook "a major reduction-in-force at the Niagara Falls Plant," including the elimination of 172 DuPont employees and "the services of a number of leased employees were also terminated."  Clarke Declaration ¶ 2.  McLellan was among those workers eventually terminated in connection with the reduction-in-force.  Clarke Declaration ¶ 10.  Specifically, the Terathane Project commenced in July 2002 and was to be completed by June 30, 2003.  *Id*. ¶¶ 4-5.  As Clarke explains, a CFC with electrical experience was needed to supervise the dismantling of the Terathane operations and the  Terathane operations to which electricity had to be cut before the operations were demolished and dismantled, a

complicated task given that the Terathane operations electricity involved the electrical supply to the entire Niagara Falls Plant.  *Id*. ¶ 6.  According to Clarke, Plant Manager Kelly Kober recommended that McLellan be chosen "as the electrical CFC on the Terathane Project because of his skills and experience and because [McLellan's] services were no longer needed in the Sodium area as a result of the restructuring that occurred in April 2002."  *Id*. ¶ 7.  Clarke maintains that had McLellan not accepted the CFC assignment to the Terathane Project in July 2002, McLellan's services would have been terminated at that time, rather than being retained for an additional year to work on the Terathane Project.  *Id*. ¶¶ 7 and 16.

In addition to McLellan, one Larry Edwards ("Edwards"), a direct DuPont employee, also worked as a CFC on the Terathane Project.  Clarke Declaration ¶ 9. Edwards, whose date of birth is October 30, 1957, was in his mid-forties when he commenced working as a Terathan Project CFC.  *Id*. ¶ 9.  As the Terathane Project's completion neared, Clarke informed McLellan's employer that DuPont would not require McLellan's services after the end of June 2003 and McLellan's work at the Niagara Falls Plant was terminated in late June 2003 when the Terathane Project was completed.  *Id*. ¶ 10.  At the same time, DuPont also terminated Edwards, a direct employee, as there was no more need for his services.  *Id*.

According to Clarke, upon the termination of McLellan's services to DuPont, one Douglas Potter, a direct DuPont employee, was working as a general CFC in the Sodium area, performing various types of CFC duties, including mechanical and electrical tasks.  Clarke Declaration ¶ 11.  Clarke explains that James Cody, whom McLellan maintains was also working as a Sodium area CFC, was a leased employee

69

working as a mechanical designer in the Sodium area at the Niagara Falls Plant. *Id.* ¶
12. Clarke maintains that McLellan's age was not a factor in DuPont's decision to
terminate his employment but, rather, McLellan was terminated only because the
Terathan Project was complete and McLellan's services as a full-time electrical CFC
were no longer needed. *Id.* Clarke never considered returning McLellan to the Sodium
area because of DuPont's policy to retain a direct employee, here, Potter, over a leased
employee, McLellan. *Id.* ¶ 15.

McLellan does not dispute any of Clarke's statements. As such, this evidence is
sufficient to rebut the presumption of age discrimination created by McLellan's *prima
facie* case. *Gallo*, *supra*, 22 F.3d at 1226. A preference for a leased employee does
not demonstrate discriminatory motive based on age.

### C.      Pretext for age discrimination

With DuPont having successfully rebutted McLellan's *prima facie* case of age-
based employment discrimination, the burden shifts to McLellan to demonstrate that the
reduction-in-force explanation DuPont proffered was a pretext for intentional age
discrimination. *Gallo*, *supra*, 22 F.3d at 1226. To do so, McLellan may either rely on
the evidenced establishing his *prima facie* case, without any additional evidence, or
present additional evidence demonstrating DuPont's proffered reason for the
termination was false. *Gallo*, *supra*, at 1226 (citing *Hicks*, *supra*, 509 U.S. at 511, and
*Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 142 (2d Cir. 1993)).

The reasonableness of an employer's reasons for the challenged adverse

employment action is probative of whether such reason is, in fact, pretext.  *Meiri*, *supra*,

759 F.2d at 997 n. 13 (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.

1979) ("The more idiosyncratic or questionable the employer's reason [for the adverse

job action], the easier it will be to expose it as a pretext.") (bracketed text added)).

Further, the inquiry as to whether an employer's putative purpose is a pretext "is

directed toward determining whether the articulated purpose is the actual purpose for

the challenged employment-related action."  *DeMarco v. Holy Cross High School*, 4

F.3d 166, 171 (2d Cir. 1993).  The tendered legitimate, nondiscriminatory reason "need

not be well-advised, but merely truthful."  *Dister*, *supra*, 859 F.2d at 1116.  As such, the

pretext inquiry "normally focuses upon factual questions such as whether the asserted

reason for the challenged action comports with the defendant's policies and rules,

whether the rule applied to the plaintiff has been applied uniformly, and whether the

putative non-discriminatory purpose was stated only after the allegation of

discrimination."  *DeMarco*, *supra*, at 171 (citing *Sabree v. United Bhd. of Carpenters*

*and Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir. 1990) (*post hoc* rationalization of

actions will not suffice to rebut plaintiff's *prima facie* case); *Grant v. Bethlehem Steel*

*Corp.*, 635 F.2d 1007, 1014-15 (2d Cir. 1980) (pretext may be established where policy

applied to black plaintiff was not applied to whites), *cert. denied*, 452 U.S. 940 (1981);

*Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980) (pretext can be established by

showing that the "asserted neutral basis was so ridden with error" that the employer

could not honestly have relied on it to justify adverse employment action); *Jolly v.*

*Northern Telecom, Inc.*, 766 F.Supp. 480, 494 (E.D.Va. 1991) (evidence adduced that

non-discriminatory rule purportedly applied to plaintiff was 'alibi' tailored to justify

discrimination)).  *Contra, Back v. Hastings on Hudson Union Free School District*, 365

F.3d 107, 124-25 (2d Cir. 2004) (holding material issue of fact existed as to whether

defendant school district personnel director and elementary school principal engaged in

unlawful gender stereotyping regarding employment suitability of mothers when

defendants advised against granting tenure to plaintiff school psychologist with young

child, such that proffered justifications for tenure denial were not real reasons for

defendants' actions but, rather were pretext for discrimination).  So also, in an age-

based employment discrimination case, "a plaintiff may be able to put into question the

genuineness of the employer's putative non-discriminatory purpose by arguing that the

stated purpose is implausible, absurd or unwise." *DeMarco*, *supra*, at 171 (citing

cases).  Further, on summary judgment, the court is required to take into account both

direct and indirect or circumstantial evidence of the employer's motive.  *Id*.

In the instant case, although in order to show DuPont's legitimate,

nondiscriminatory reason for McLellan's termination was mere pretext to the real,

discriminatory reason, McLellan need not point to new evidence apart from what was

already presented to establish a *prima facie* case of age-based employment

discrimination, McLellan limits his response in opposition to summary judgment to

characterizing DuPont's proffered legitimate, nondiscriminatory reasons as "curious"

given that DuPont preferred a direct employee over a leased employee, and chose two

younger and less qualified employees for the Sodium area CFC position a year before

McLellan was terminated.  Plaintiff's Response at 13-14.  According to McLellan,

DuPont's decision to terminate him was motivated by McLellan's age and a desire to

prevent McLellan from vesting in the Plan.  *Id*. at 14.

McLellan, however, references no caselaw suggesting that leased employees are members of a protected class for purposes of employment discrimination claims and the court's research has revealed none.  As such, there is no merit to McLellan's asserted age-based employment discrimination claim insofar as DuPont's decided to terminate, in connection with its undisputed reduction in force, any worker hired as a contract or leased worker.

Further, DuPont did not merely articulate its legitimate nondiscriminatory reason for terminating McLellan; rather, DuPont also substantiated such reason with the Clarke Declaration and copies of internal memoranda (April 2, 2001 Memorandum, Grasso Exh. G and April 29, 2002 Memorandum, Grasso Exh. H) discussing DuPont's impending reduction-in-force, thereby rendering more difficult McLellan's task of proving pretext.  *Meiri*, *supra*, 759 F.2d at 997.  Significantly, such evidence establishes that DuPont has not resorted to any *post hoc* rationalization of its decision to terminate McLellan.  *DeMarco*, *supra*, 4 F.3d at 171.  Nor is there any evidence suggesting DuPont's stated purpose for terminating McLellan is "implausible, absurd or unwise." *Id*. That Edwards, a direct DuPont employee in his mid-forties, was terminated along with McLellan demonstrates that DuPont's policy in terminating the Terathane Project employees upon its completion was uniformly applied.

Conspicuously absent from McLellan's papers in opposition to summary judgment is any discussion or evidence suggesting the DuPont made it a point to target older worker for elimination in connection with the reduction in force.  In fact, McLellan has not proffered any evidence showing that older workers on the Terathane Project were not reassigned to other positions with DuPont to avoid lay-off whereas younger

ones were, nor that DuPont adopted a policy of transferring older workers to the Terathane Project and then terminating their employment upon the project's completion, thereby engaging in age-based employment discrimination under the guise of a legitimate reduction-in-force.  This fact is especially significant given the large number of positions eliminated.  *See Burger*, *supra*, 94 F.3d at 833 (fact that an entire plant was shut down, thereby eliminating a large number of workers, including an older maintenance employee assigned to the closed plant, was not evidence of age-based employment discrimination even though younger maintenance employee continued to be employed by the company in a similar plant).  Nor is there any indication that DuPont transferred a number of older workers, whose previous jobs remained after the reduction in force, to the Terathane Project so as to eliminate the workers with the completion of the Terathane Project.  These facts also conclusively rebut McLellan's assertion that age discrimination is demonstrated by DuPont's desire to reduce its pension obligations to older workers.

Absent any such evidence, the court is left with McLellan's bald and conclusory assertion that the fact that, following the termination of the Terathane Project, McLellan was not returned his previous CFC position in the Sodium area, that position having been filled by the younger Potter upon McLellan's transfer one year earlier, is sufficient evidence to permit a reasonable jury to conclude, by a preponderance of the evidence, that DuPont arranged to transfer McLellan to the Terathan Project so as to eventually terminate McLellan upon the project's completion based on McLellan's age.  Given DuPont's substantial evidence to the contrary, this argument is simply too attenuated to spare McLellan's age-based employment discrimination claim under New York law from

summary judgment.

## **<u>CONCLUSION</u>**

Based on the following, Plaintiff's motion for partial summary judgment on the Second Cause of Action (Doc. No. 60) should be GRANTED; Defendants' motion for summary judgment (Doc. No. 65) should be DENIED as to the Second Cause of Action and GRANTED as to the First, Fourth and Fifth Causes of Action.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     September <u>22</u>, 2006
             Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     September 22, 2006
           Buffalo, New York